**UNITED STATES of America,
Plaintiff,**

**v.**

**Arthur BUCKHANON et al.,
Defendants.**

**No. 4–73–Cr. 120.**

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 17, 1973.

---

Earl P. Gray, Asst. U. S. Atty., Minneapolis, Minn., for plaintiff.

Ronald I. Meshbesher, Minneapolis, Minn., for defendant Arthur Buckhanon.

Reed K. Mackenzie, Minneapolis, Minn., for defendant Sneed.

## MEMORANDUM ORDER

LARSON, District Judge.

Defendants Buckhanon and Sneed seek to suppress evidence obtained through a warrantless arrest and search conducted on May 23, 1973.

Arthur Buckhanon and Cheryl Sneed have each been indicted on one count of possession with intent to distribute 801.5 grams of heroin and one count of conspiracy to possess and distribute heroin, both in violation of 21 U.S.C. § 841(a)(1). In addition, defendant Buckhanon has been indicted for one count of possession with intent to distribute 305 grams of heroin and one count of distribution of that quantity of heroin, both in violation of 21 U.S.C. § 841(a)(1).

Drug Enforcement Administration Agent Rieff was notified by an unidentified informant that the informant knew an individual who could be called and who would deliver heroin to Minneapolis. Agent Rieff made arrangements for the placement of a listening device on the informant's telephone and two calls were placed to Los Angeles, California, the second of which on or about May 17, 1973, culminated in an order for heroin. On May 18, 1973, the contact in Los Angeles called back and told the informant that he had the heroin and would come to Minneapolis. On May 20 the California contact, later identified as Arthur Buckhanon, arrived in Minneapolis and was observed by Agent Rieff in the company of a negro female, later identified as Adale Holmes. The informant met initially with defendant Buckhanon and his companion and told them that he would have to get the $9,600 to pay for the heroin. Agent Rieff then placed a small transmitter on the informant's person and the informant met with Buckhanon and Holmes, delivered the money, and received the

heroin. The informant on that occasion spoke with Buckhanon and Holmes about ordering either a half or whole kilo of the substance. Immediately thereafter, the informant delivered the heroin to Agent Rieff and then returned for more conversation with Buckhanon and Holmes. The following day, May 21, 1973, Buckhanon and Holmes departed for Los Angeles. Buckhanon subsequently called from Los Angeles and reported that he would arrive on May 23, 1973, with a quantity of heroin. On May 23, Arthur Buckhanon and Cheryl Sneed were observed by narcotics agents arriving at the Minneapolis airport. The defendants were arrested and walked to the airport security room. At that time they were advised of their rights and searched. Twenty-nine ounces of heroin were found in Cheryl Sneed's overnight bag and 6.9 grams of heroin were found in Arthur Buckhanon's pants pocket.

■ Defendants first argue that the search was illegal because it was made in connection with an unlawful arrest without a warrant and in violation of the Fourth Amendment. The recent decision of the 8th Circuit, United States v. Bazinet, 462 F.2d 982 (8th Cir. 1972), makes clear that "[u]nder Minnesota law, a warrantless arrest is authorized if there is probable cause to believe that a crime has been committed and that the person arrested has committed it." 462 F.2d at 986. At the time of the arrest, narcotics agents had the following information at their disposal: (1) The informant had indicated to agent Rieff that he had dealt in drugs with Buckhanon before and that it was Buckhanon's practice to use female couriers in the sale and delivery of heroin; (2) Agent Rieff had overheard calls arranging and confirming both the sale and delivery of the heroin; (2) narcotics agents saw Buckhanon and a female companion enter the same room with the informant, heard the sale of $9,600 of heroin take place via a transmitting device on the informant's person, and had the heroin derived from that sale deliv-

ered to them immediately thereafter; (4) narcotics agents overheard a call from Buckhanon telling the informant that he could get more heroin and that he would be arriving in Minneapolis on May 23; (5) Buckhanon and Sneed were seen deplaning in Minneapolis on May 23. The information provided by the informant was corroborated both by the appearance of Buckhanon and Holmes on May 20 and the appearance of Buckhanon and Sneed on May 23. These facts indicate, and the Court holds, that there was probable cause for an arrest.

The Court in United States v. Bazinet, *supra*, at 987, quotes Lee v. United States, 363 F.2d 469, 473 (8th Cir. 1966), cert. denied, 385 U.S. 947, 87 S. Ct. 323, 17 L.Ed.2d 227 (1966), regarding a search based on probable cause:

"... [an] arrest in a public place based on probable cause and [a] subsequent search [incident thereto is] not an unreasonable search and seizure in violation of the ... Fourth Amendment .... An arrest warrant is not required even though there may be time to obtain one when the ensuing arrest is based upon probable cause. The test is one of probable cause for the arrest."

■ Defendants next emphatically argue that because conversations with defendant Buckhanon were taped without the use of a tone warning device as required by an order of the Federal Communications Commission, the evidence so obtained is illegal and that it and its fruits must be suppressed. The order in question is derived from In the Matter of Use of Recording Devices in Connection with Telephone Service, November 28, 1947, which reads in pertinent part:

"It is ... ordered, that the use of recording devices in connection with interstate and foreign message toll telephone service is authorized, subject to the following conditions:

(1) That such use is accompanied by adequate notice to all parties to

the telephone conversation that the conversation is being recorded;

(2) That such notice will be given by the use of an automatic tone warning device, which will automatically produce a distinct signal that is repeated at regular intervals during the course of the telephone conversation when the recording device is in use; . . . "

The order arose out of investigations by the Commission concerning the use of recorders in connection with telephone communications. After the war there had been a substantial increase in the use of such devices and a legitimate need was recognized concerning their use in business and government affairs. There was concern, however, both over the effect of such devices upon the quality of telephone service as well as privacy of the communications recorded. *See generally,* In the Matter of Use of Recording Devices in Connection with Telephone Service, Docket No. 6787, adopted March 24, 1947.

A literal reading of the order, without more, supports the defendants' contentions since the order refers to assurances of adequate notice "to all parties to the telephone conversation that the conversation is being recorded." It is this Court's opinion, however, that the Federal Communication Commission's Order is not applicable to the case at hand.

In a 5th Circuit opinion of Judge Wisdom, Carnes v. United States, 295 F.2d 598 (1961), the issue of admissibility of evidence recorded by a device attached to a telephone was decided. In referring to various cases discussed earlier in that opinion, among them Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), the court held in connection with section 605 of the Federal Communications Act [47 U.S.C.A. § 605 (1962)]:

"First, testimony as to a telephone conversation listened to with the consent of only one of the parties to the conversation is not inadmissible under Section 605. Second, such testimony does not become inadmissible simply because it was recorded by an electrical or mechanical device attached to an extension phone or telephone wiring at the locality of the consenting party. The significant fact in the cases where eavesdropping has been approved is that a third person is listening to a conversation directly, or indirectly through an electrical device, with the consent, and often assistance, of one of the parties, and that the other party does not know that his words are overheard." 295 F.2d at 602.

Although this language does not refer specifically to the F.C.C. Order presently under consideration, it does refer to the lack of knowledge by one of the parties being recorded that the conversation is being electrically transcribed. Thus the court in *Carnes* recognized the legitimacy of using as evidence recordings of conversations made without the knowledge of one party to the conversation. This holding effectively precludes the requisite of having a tone-warning device in operation at the time that the recording is made.

In Battaglia v. United States, 349 F.2d 556 (1965), defendant had been convicted of six counts of fraud by wire. One point on appeal was similar to that raised by defendants in this case. The Court at 559, 560 stated:

"Appellant's contention that the recording of the conversation without advance notice to appellant and without the use of a tonewarning device as required by an order of the Federal Communications Commission is answered by Ferguson v. United States, 307 F.2d 787 (10th Cir. 1962), Opinion withdrawn on other grounds, 329 F.2d 923 (10th Cir. 1964). There the court said at p. 790, of 307 F.2d:

'* * * a regulation or order directed to the carriers over whom the Federal Communications Commission has jurisdiction, 47 U.S.C.A. § 152, cannot be viewed as creating a new crime prohibited to the citizenry nor as changing the rules

of evidence evolved in the federal courts.' "

While the language of *Battaglia* is puzzling grammatically, it stands for the proposition relevant here that the F.C.C. Order will not change the rules of evidence in the Federal courts.

Apart from the authorities already cited, however, this Court gives greatest weight to certain provisions of 18 U.S.C.A. § 2510 et seq. (1970), as the basis for denying defendant's motion. The mentioned sections of the Omnibus Crime Control and Safe Streets Act of 1968 deal with the prohibition of the interception of wire or oral communications except under expressly limited circumstances. Section 2511(2)(c) provides that:

"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

Section 2518(8)(a) provides that:

"The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device."

1968 U.S.Code Cong. and Admin.News, Pub.L. 90–351, § 801(c), at p. 253, provides that:

"On the basis of its own investigations and of published studies, the Congress makes the following findings:

\*   \*   \*   \*   \*   \*

(c) Organized criminals make extensive use of wire and oral communications in their criminal activities. The interception of such communications to obtain evidence of the commission of crimes or to prevent their commission is an indispensable aid to law enforcement and the administration of justice."

It is clear from the language both of the Congress' findings, as well as the operative provisions of the law, that surveillance of the type at issue in this case is recognized as a legitimate tool of law enforcement. To require that the recording prescribed in § 2518(8)(a) be accompanied by a tonewarning device as set forth in the F.C.C. Order would be contrary to the findings of the Congress and their apparent purposes in allowing exceptions to the prohibition of interception of wire communications.

 Contrary to the defendants' position that a recording of wire communications can be made only under court order, the wiretap statute requires the recordation of intercepted communications by *any* means authorized by the chapter, including that provided in § 2511(2)(c).

For the preceding reasons, this Court must deny the motions of defendants Buckhanon and Sneed to suppress.

It is so ordered.