UNITED STATES of America, Appellee,

v.

**Anthony V. DALY, Appellant.**

No. 75–1837.

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1976.

Decided May 5, 1976.

---

Irl B. Baris, St. Louis, Mo., for appellant; Kenneth H. Graeber, St. Louis, Mo., on brief.

Marc Philip Richman, Washington, D. C., for appellee; Donald J. Stohr, U. S. Atty., and John R. Birkby, Sp. Atty., Jerome M. Feit, James A. Rothschild, Attys., Dept. of Justice, Washington, D. C., on brief.

Before LAY, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

Anthony Daly appeals his conviction on twelve counts of mail fraud and conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1341. We affirm.

The government's evidence at trial established that on three separate occasions, the defendant and three other persons[1] engaged in schemes to defraud insurance companies by submitting false claims for theft losses. The reported thefts were staged by Daly and his confederates. The mail was essential to the schemes since the false claims were processed through the mail.[2]

This appeal concerns the admissibility of certain evidence of the insurance fraud schemes produced by court-authorized wiretaps. The wiretaps, which were placed on three telephones subscribed to by the defendant, were used to intercept conversations during two fifteen day intercept periods. The electronic surveillance was authorized to investigate Daly's participation in a racketeering operation which involved credit card fraud.

The government requested the first intercept order on January 26, 1973. The application was supported by a 38 page affidavit of Postal Inspector Calvin Olk. The request was granted and the interception was conducted from January 27, 1973, until February 10, 1973. The authorizing judge, United States District Judge John Regan of the Eastern District of Missouri, required and received two five day reports describing the progress of the wiretaps.

On February 23, 1973, Judge Regan entered an order extending the wire interception for fifteen more days. The government's application in this instance was supported by a 14 page affidavit of Inspector Olk. The surveillance was conducted from February 23, 1973, until March 10, 1973. Pursuant to Judge Regan's order, the government again submitted two five day reports describing the progress of the wiretaps during the interception period.

Daly urges numerous points of error. We discuss these points seriatim.

### I. Alternative Means.

Daly first argues that the applications for the wiretap orders failed to show that normal investigative techniques were tried and failed or why they reasonably appeared to be unlikely to succeed if tried or were too dangerous. We find this argument without merit.

18 U.S.C. § 2518 sets forth the procedure for interception of wire and oral communi-

---

1. The three coconspirators were also convicted of mail fraud.

2. Daly does not challenge the sufficiency of the evidence on this appeal.

cations. Section 2518(1)(c) requires that each application include the following information:

a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous.

Section 2518(3)(c) provides that the judge may authorize interception of wire or oral communications if, *inter alia,* he finds the following:

normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

■ We recognize that Congress intended these sections to restrict wiretaps to those which are necessary as well as reasonable. But Congress did not require the exhaustion of "specific" or "all possible" investigative techniques before wiretap orders could be issued. *United States v. Smith,* 519 F.2d 516, 518 (9th Cir. 1975). Congress prohibited wiretapping only when normal investigative techniques are *likely* to succeed *and* are not too dangerous. "Merely because a normal investigative technique is theoretically possible it does not follow that it is likely." S.Rep. 90–1097, U.S.Code Cong. and Admin.News, pp. 2112, 2190 (1968). Sections 2518(1)(c) and 2518(3)(c) are only designed to ensure that wiretapping is "not to be routinely employed as the initial step in criminal investigation, *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341, 353 (1974), and " * * * to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United*

*States v. Kahn,* 415 U.S. 143, 153, 94 S.Ct. 977, 983, 39 L.Ed.2d 225, 236, n.12 (1974). The government's showing must, of course, be tested in a "practical and commonsense fashion." *United States v. Kirk,* 534 F.2d 1262, at 1274, (8th Cir., filed April 22, 1976); *United States v. Brick,* 502 F.2d 219, 224 n.14 (8th Cir. 1974), *quoting,* S.Rep. 90–1097, *supra,* at p. 2190. And as in other suppression matters, considerable discretion rests with the judge to whom the wiretap application is made. *United States v. Smith, supra,* 519 F.2d at 518.

■ Applying these principles to the facts of this case, we find that Judge Regan properly concluded that electronic surveillance was justified.[3] The affidavit of Postal Inspector Olk, offered in support of the application for the first wiretap order, indicates that normal investigative techniques had been extensively used by the government before the wiretap authorization was sought. These techniques included questioning of several coconspirators, consent recording to a limited extent, physical surveillance, examination of telephone toll records and use of at least one undercover agent. An extensive racketeering operation involving use of credit cards was uncovered by this investigation.

Before the initial wiretap order was sought, however, the investigation had failed to uncover critical information in the following areas: 1) the identities of persons from whom Daly received the stolen credit cards; 2) the extent to which Daly's operation involved other service stations in the St. Louis area; 3) the identities of persons to whom Daly sold the credit cards; and 4) the extent to which Daly's operation had infiltrated businesses other than service stations. Undercover investigation produced

---

**3.** We reject Daly's argument that the wiretapping was improper because the initial investigation uncovered facts which were arguably sufficient to establish guilt. The initial investigation uncovered only the tip of the iceberg. The extent of the conspiracy, as well as the identities of the coconspirators, were largely unknown to the government before the wiretaps were authorized. As stated in *United States v. Armocida,* 515 F.2d 29, 38 (3d Cir.),

*cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975), a case involving an extensive narcotics operation:

Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned.

only limited information. Daly's operation was conducted in a covert manner and the undercover agent was told nothing more than was necessary to perform his limited role in the service station operations. Furthermore, the postal authorities knew, from an examination of the telephone toll records, that Daly used his personal and business telephones extensively in conducting the operation. Thus traditional surveillance techniques were inadequate.

■ Two weeks after the original fifteen day wiretap was terminated, the government requested, and received, an extension order permitting interception for fifteen more days. The affidavit submitted in support of the extension order stated that although some understanding had been obtained of Daly's role in the racketeering operation, the identities of most of his confederates had not been discovered. This failure was described by Inspector Olk in the following terms:

> The lack of success in establishing the identities of those persons who are associated with Anthony V. Daly in the scheme to defraud is due in large part to the surreptitious way in which Anthony V. Daly and his associates use the telephones. Last names are seldom mentioned; credit cards are referred to as "plastic" or "things"; conversations are seldom lengthy. The manner in which the telephones are utilized demonstrates a familiarity on the part of Anthony V. Daly and his associates with one another's voices, to the extent that complete name identification is unnecessary, and with terminology describing credit cards, the use of which terminology to a lay ear has no independent significance.

This case is, we feel, a classic instance where electronic eavesdropping was reasonable and necessary. Daly's reliance on telephones, his distrust of confederates, and his use of specialized jargon, rendered normal investigative techniques impractical. The broad scope and complexity of the operation compounded the investigative dilemma. Judge Regan properly concluded that alternative investigative means were inadequate.[4]

## II. Interceptions Authorized.

■ Defendant next argues that Judge Regan's wiretap authorization was used for a purpose—mail fraud—not authorized by 18 U.S.C. § 2516. We find that wiretapping may be used to investigate mail fraud under certain circumstances present in this case.

Section 2516, as amended in 1970, includes within the list of specific offenses for which interception of wire communications is permitted, the activities penalized by 18 U.S.C. § 1963. H.Rep. 91–1549, U.S.Code Cong. and Admin.News, pp. 4007, 4036 (1970). Section 1963 penalizes any pattern of racketeering activity affecting interstate commerce proscribed by 18 U.S.C. § 1962. Section 1961(1)(B), which defines the activities subject to the racketeering provisions, specifically refers to the mail fraud statute, 18 U.S.C. § 1341.

Thus, Judge Regan's order permitted interceptions specifically authorized by section 2516—interceptions of conversations relating to mail fraud racketeering activities violative of 18 U.S.C. §§ 1961 *et seq.* Significantly, Daly pleaded guilty to participating in a pattern of racketeering under section 1962(c) *as a result of the wiretap.* Daly was involved in (indeed in charge of) a comprehensive scheme, covering at least three states, to defraud several major oil

---

4. *United States v. Kalustian*, 529 F.2d 585 (9th Cir., filed Dec. 11, 1975), cited in support of defendant's argument, is distinguishable from the facts in this case. In *Kalustian*, alternative means of investigation were discarded because "knowledge and experience" in investigating other gambling cases convinced government agents that normal techniques were unlikely to succeed. *Id.*, 529 F.2d at 587. *But see United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975), *appeal docketed*, 44 U.S.L.W. 3505 (U.S. March 8, 1976). The court in *Kalustian* ordered the evidence suppressed because the alternative means were given little opportunity to succeed. As discussed above, government agents used alternative means in this case. Inspector Olk's affidavits explain why those investigative techniques were inadequate.

companies in violation of sections 1962 and 1963. The bogus billings of the oil companies were conducted through the mail. The identities of many of his confederates were unknown to the government and could not be ascertained by normal investigative techniques. The defendant's activities were, therefore, precisely the type of covert activities for which Congress permitted wiretapping.

█ That the insurance fraud operation was not specifically mentioned in the authorization order does not render evidence of the scheme derived from the wiretap inadmissible. Even assuming that the wiretap orders did not cover the insurance fraud,[5] it is now well settled that Title III "* * * permits the use in court of evidence obtained by wiretap of a crime other than the crime upon which the court order was premised." *United States v. Cox*, 462 F.2d 1293, 1301 (8th Cir. 1972), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974).

### III. Disclosure Order.

Defendant also attacks the validity of the indictment. He argues that the indictment was defective, and therefore the conviction must be reversed, because Judge Regan's order did not specify surveillance for insurance fraud and the government did not obtain a disclosure order before the interceptions were presented to the grand jury. Such disclosure, defendant argues, is mandated by 18 U.S.C. § 2517(5). A disclosure order was obtained by the government on August 18, 1975—before the indictment was returned by the grand jury.

5. It appears that the insurance fraud constituted a pattern of racketeering activity under 18 U.S.C. §§ 1961 *et seq.* which fell within the offenses specified in the wiretap orders. See note 7, *infra*.

6. Even assuming that this issue was properly presented for review, defendant would not be entitled to dismissal of the indictment and reversal of his conviction. Judge Regan's order authorized interception of wire communications over three telephones used by Daly in carrying on racketeering activities relating to

This argument is raised for the first time in this court. Because the argument was not presented in district court, the record before us does not reveal whether any of the intercepted conversations were disclosed to the grand jury before the disclosure order was obtained.

█ Under Fed.R.Crim.P. 12(b), "[a]ny objections to the validity of the indictment were waived when they were not presented by motion before trial." *United States v. Calvert*, 523 F.2d 895, 901–902 (8th Cir. 1975). Failure to raise this issue in the court below, and the inadequacy of the record before us, forecloses review. *United States v. John*, 508 F.2d 1134, 1140 (8th Cir.), *cert. denied*, 421 U.S. 962, 95 S.Ct. 1948, 44 L.Ed.2d 448 (1975).[6]

### IV. Minimization.

Daly contends that the evidence derived from the taps must be suppressed because the government failed to comply with the minimization rule of 18 U.S.C. § 2518(5) and Judge Regan's order. We do not agree.

Section 2518(5) provides:

Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter * * *.

Section 2518(5) was passed by Congress in order to comply with the constitutional mandate of *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), that wiretapping must be conducted with particularity. S.Rep. 90–1097, U.S.Code

mail fraud under 18 U.S.C. §§ 1341, 1962(c), 1962(d), and 1963. Daly's insurance fraud enterprise was also mail fraud under § 1341 since the mail was an essential part of the operation. Mail fraud under § 1341 is subject to the racketeering provisions by virtue of § 1961(1)(B). Since at least three instances of such fraud were involved, the scheme constituted a pattern of racketeering under § 1961(5). Thus the insurance fraud operation fell within the offenses specified in the court order and a disclosure order was not required.

Cong. and Admin.News, pp. 2112, 2192 (1968).

This provision is nothing more than a command to limit surveillance as much as possible. *United States v. Cox, supra,* 462 F.2d at 1300. The minimization standard is one of reasonableness which is to be ascertained on a case-by-case basis. *Id.*; S.Rep. 90–1097, U.S.Code Cong. and Admin. News, pp. 2112, 2192 (1968); *United States v. Armocida,* 515 F.2d 29, 42 (3d Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Quintana,* 508 F.2d 867, 873–874 (7th Cir. 1975); *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1018, cert. denied, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974).

The cases have discussed a number of factors which are relevant in determining whether a particular intrusion was unnecessary. *United States v. Kirk, supra,* 534 F.2d at 1275. We do not imply that a trial or reviewing court should not consider other factors in cases presenting different circumstances.

The first factor is the scope of the criminal enterprise. Large and sophisticated conspiracies may justify more electronic surveillance than a single criminal act. S.Rep. 90–1097, U.S.Code Cong. and Admin.News, pp. 2112, 2192 (1968); *United States v. Cox, supra,* 462 F.2d at 1300; *United States v. Armocida, supra,* 515 F.2d at 44; *United States v. Quintana, supra,* 508 F.2d at 874; *United States v. James, supra,* 494 F.2d at 1019. This is an especially strong consideration where, as here, the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped. *United States v. Quintana, supra,* 508 F.2d at 874; *United States v. James, supra,* 494 F.2d at 1019.[7]

The second factor is the government's reasonable expectation of the content of particular calls. As stated in *United States v. James, id.,* 494 F.2d at 1020:

If at the time of the initiation of the wiretap the government knows those persons who are suspected of the criminal offense, it can tailor its minimization efforts to avoid monitoring incoming or outgoing calls involving other persons; similarly, if the government knows during what time of the day the telephone will be used for criminal activity, it can avoid intercepting calls at other times. These considerations affect the initial minimization tactics employed by the government, but agents may expand or contract their interception policy as the wiretap continues * * *.

*See also United States v. Quintana, supra,* 508 F.2d at 874. If at the outset the agents have no way of identifying innocent calls either by person or subject matter, comprehensive monitoring may be justified. *United States v. Scott,* 170 U.S.App.D.C. 158, 516 F.2d 751, 755 n.7 (1975). On the other hand , if a pattern of innocent conversation develops listening and recording should cease during such conversations. Greater monitoring may be justified where, as in this case, the coconspirators employ specialized jargon which appears innocent to the lay ear yet is relevant to the criminal activity. *United States v. Quintana, supra,* 508 F.2d at 874 n.6.

We recognize that monitoring agents are not gifted with prescience. *United States v. Cox, supra,* 462 F.2d at 1301. Interception of innocent conversations cannot be totally eliminated. Because even innocent conversations often times turn to criminal matters, spot-checking of such conversations is permissible especially in a case such as this involving a broad scope of criminal

---

**7.** Research discloses a number of cases in which the broad scope of the criminal enterprise, and other factors, justified interception of most, if not all, conversations. *See, e. g., United States v. Cox,* 462 F.2d 1293, 1301 (8th Cir. 1972), cert. denied, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *United States v.* *Quintana,* 508 F.2d 867, 875 (7th Cir. 1975); *United States v. Bynum,* 485 F.2d 490, 500–502 (2d Cir. 1973), vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), appeal after remand, 513 F.2d 533 (2d Cir.), cert. denied, 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975).

activity and a sophisticated criminal element.

A third consideration is the continuing judicial supervision of the authorizing judge. Section 2518(6) permits the authorizing judge to require interim reports showing what progress has been made with respect to the authorized objective and the need for continued interception. Courts have been more willing to find good faith minimization where such reports have been required and reviewed at frequent intervals. *See United States v. Cox, supra,* 462 F.2d at 1301; *United States v. Quintana, supra,* 508 F.2d at 875 and cases cited therein.

■ We agree with the district court that the monitoring agents in this case substantially complied with the minimization requirement of § 2518(5). Judge Regan's order, which required minimization, was read to the monitoring agents before any surveillance was permitted. Six of the seven monitoring agents testified at the suppression hearing that, with the exception of spot-checking, only incriminating conversations were overheard and recorded.[8] One agent, Inspector Maki, testified that he listened to all conversations, although he recorded only those which were incriminating. The deviation caused by Maki's surveillance was de minimus, in our view, since he monitored less than 10% of the conversations involved. No evidence was presented that he overheard any innocent conversations.

Minimization was made difficult in this case by a number of factors. The government was investigating a conspiracy of unknown dimensions. The identities of many coconspirators were unknown. The conspiracy was sophisticated; the coconspirators conversed no longer than necessary and used specialized jargon to refer to credit cards and mail fraud. Since Daly's wife and personal friends were involved in the scheme, interception of many personal conversations was unavoidable.

Judge Regan required and received five day reports of the fruits of the tap as well as the manner in which the conversations were being monitored. Under these circumstances, we hold that the government established that the interceptions were reasonably minimized.

### V. Failure to Record.

■ Daly's final attack on the wiretaps concerns the failure of the agents to record all communications to which they listened. He claims that this failure violates 18 U.S.C. § 2518(8)(a) and requires suppression of the conversations. With the exception of certain de minimus conversations monitored by Inspector Maki, discussed *supra,* the monitoring agents failed to record only when they made spot-checks of innocent conversations.

Section 2518(8)(a) requires, *if possible,* that the contents of any intercepted conversations be recorded on tape or wire or other comparable device. The Senate Report states that any interception must be recorded *if practicable.* S.Rep. 90–1097, *supra,* at p. 2193. The Report indicates that the purpose of § 2518(8)(a) is to ensure the admissibility of intercepted communications at trial. *Id.*

■ Even assuming, without deciding, that § 2518(8)(a) requires even innocent conversations to be recorded in spot-checking situations,[9] we fail to see how Daly was prejudiced by the failure to record. Defendant does not allege, and has not shown, that any incriminating conversations were recorded out of context. The minimization

---

8. This procedure has been held to be a reasonable method of complying with the minimization order of the district court. *United States v. Doolittle,* 507 F.2d 1368, 1372 (5th Cir.), *aff'd on rehearing en banc,* 518 F.2d 500 (5th Cir. 1975), *petition for cert. filed,* 44 U.S.L.W. 3320 (U.S. Oct. 2, 1975) (No. 75–513).

9. Whether § 2518(8)(a) requires recording all spot-checks is a question we need not decide here. We find nothing in the legislative history which requires this result. Recordation is required only "if possible" or "if practical." Complete recording is a result which we find inconsistent, and possibly in conflict with, the minimization provision of § 2518(5).

requirement was met. Suppression is not required under these circumstances.[10]

The judgment of conviction is affirmed.

---

10. The defendant challenges the authority of the special strike force attorney to appear before the grand jury. This claim has been rejected in this Circuit, *United States v. Wrigley*, 520 F.2d 362, 370 (8th Cir.), *cert. denied*, 423

U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975), and is similarly rejected here.