UNITED STATES of America, Appellee,

v.

Maceo CLERKLEY, Appellant.

UNITED STATES of America, Appellee,

v.

Julius COTTMAN, Appellant.

UNITED STATES of America, Appellee,

v.

Rufus JONES, Appellant.

UNITED STATES of America, Appellee,

v.

Robert R. LONDON, a/k/a Fifi London, Appellant.

UNITED STATES of America, Appellee,

v.

Robert HIMES, Appellant.

UNITED STATES of America, Appellee,

v.

Richard James GENCO, Appellant.

UNITED STATES of America, Appellee,

v.

John A. SHADE, Appellant.

Nos. 76–1663 to 76–1669.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 10, 1977.

Decided May 25, 1977.

Harold I. Glaser, Baltimore, Md. (Richard M. Karceski, Columbia, Md., and Michael E. Kaminkow, Baltimore, Md., on brief), for appellants in 76–1666, 76–1665, 76–1664 and 76–1663.

Peter G. Angelos, Baltimore, Md., for appellant in 76–1668.

Howard L. Cardin, Baltimore, Md., on brief, for appellant in 76–1669.

Jeffrey C. Hines, Baltimore, Md., on brief, for appellant in 76–1667.

Marsha A. Ostrer, Asst. U. S. Atty., Baltimore, Md. (Jervis S. Finney, U. S. Atty., Baltimore, Md., on brief), for appellee in 76–1663, 76–1664, 76–1665, 76–1666, 76–1667, 76–1668 and 76–1669.

Before WINTER, CRAVEN * and BUTZNER, Circuit Judges.

WINTER, Circuit Judge:

Defendants, together with others, were indicted by a federal grand jury on a charge of violating 18 U.S.C. § 1955 (conducting an illegal gambling business). Defendants London, Jones and Cottman were tried before a jury and found guilty of violating the statute. Defendants Genco, Himes, Shade and Clerkley were tried without a jury and also found guilty as charged. These appeals ensued. At trial, the various defendants moved to suppress all incriminating evidence secured by wiretap. The district judge denied this motion, holding that the government fully complied with the terms of the federal wiretap statute. The correct-ness of this ruling is the principal issue on appeal. We affirm.

## I.

The one-count indictment alleged that fourteen named defendants (including the seven who now appeal), one Albert Isella, and others known and unknown to the grand jury, were engaged in an illegal numbers lottery business. The government's evidence established that the operation was a major "gambling lay off" business. A "lay off" operation enables professional bookmakers to diminish risk by re-betting or "laying off" large bets with other gamblers. *United States v. Box,* 530 F.2d 1258, 1261 (5 Cir. 1976); *United States v. Bernstein,* 509 F.2d 996, 1002 n.14 (4 Cir. 1975), *vacated,* 430 U.S. 902, 97 S.Ct. 1167, 51 L.Ed.2d 578 (1977) (No. 74–1486); *United States v. Bobo,* 477 F.2d 974 (4 Cir. 1973), *cert. denied sub nom., Gray v. United States,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975). The proof showed that London, Genco and Isella were partners in overall control of the operation, with London as the senior partner and Genco and Isella having lesser, though substantial, interests. Himes was the clerk and record keeper for the operation. Shade, Clerkley, Cottman and Jones all owned substantial books and regularly "laid off" heavily bet numbers to the London enterprise through Himes, who performed his duties by telephone at his home.

At trial, the government relied heavily upon evidence secured through electronic surveillance. Pursuant to orders signed by Judges Harvey and Young of the district court, FBI agents installed a microphone at London's place of business and "pen register" and intercepting devices at the Himes residence.[1]

---

* Judge Craven died before preparation of this opinion. However, following argument, he expressed agreement with this result.

1. A "pen register" device is used to trace telephone calls. A detailed explanation of its use is found in *United States v. Caplan,* 255 F.Supp. 805, 807 (E.D.Mich.1966). After a substantial number of calls were traced to premis-es where it was reasonably known that numbers gambling was being conducted, the pen register was augmented by an interception device.

The affidavits supporting the applications for orders establish that London's place of business was an office where much of the business was transacted in person but that Himes apparently transacted his business from his home by

FBI agents monitored all conversations at London's office whenever any of three partners were present. Recordings were made of those conversations dealing with gambling activities. Logbooks were also maintained, indicating in almost minute-by-minute fashion the identities of persons known to be present, the nature of the conversation then occurring, and the use of recording apparatus (if any). This monitoring lasted from August 24, 1974 until September 12, 1974.

FBI agents also monitored the use of a telephone at the Himes residence. A tape recorder was activated each time an incoming or outgoing call was initiated. Agents "spot checked" each call to determine its nature. If the call dealt with gambling, monitoring continued and the call would be taped in its entirety. If the call dealt with personal matters, all monitoring and recording would cease. A second set of logbooks was maintained, indicating the time, content, and recording (or non-recording) of every call. This activity continued from September 6, 1974 until September 24, 1974.

## II.

At trial, defendants moved the district court to exclude all evidence secured by wiretap. The motion was denied. Defendants contend that the evidence should have been suppressed, asserting allegedly fatal variances between government conduct and the terms of the wiretap statute.

## A.

Electronic eavesdropping by law enforcement personnel is governed by the federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510, *et seq.* The wiretap statute was intended to make an accommodation between competing goals of crime control and protection of the right to privacy.[2] A variety of controls are imposed on police action, intended to "delineat[e] on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." [1968] U.S.Code, Cong. & Ad.News, pp. 2112, 2153.

Defendants' initial contention is that the wiretap orders, signed by Judges Harvey and Young, were predicated upon an insufficient showing of need. Under the wiretap statute, intercepted wire or oral communication is rendered inadmissible in evidence unless it was intercepted in compliance with the statute. 18 U.S.C. §§ 2515, 2518(10)(a). The statute requires that the government apply for a judicial order before electronic surveillance may begin. 18 U.S.C. § 2516. In addition, the government is required to show, and the authorizing judge must find, a compelling need for this type of activity. 18 U.S.C. § 2518(1)(c), (3)(c). Specifically, there must be a showing that "other investigative procedures have been tried and have failed or . . . reasonably appear

---

telephone. Undoubtedly, this is why the agents sought and were granted authority to install a microphone in London's office so that all conversations could be monitored while they sought only surveillance of telephone calls at the Himes' residence.

2. Congress noted that wiretaps were needed to combat the rise of organized crime.

Victims, complainants, or witnesses are unwilling to testify because of apathy, fear, or self-interest, and the top figures in the rackets are protected by layers of insulation and direct participation in criminal acts. Information received from paid informants is often unreliable, and a stern code of discipline inhibits the development of informants against organized criminals. In short, intercepting the communications of organized criminals is the only effective method of learning about their activities.

[1968] U.S.Code, Cong. & Ad.News, pp. 2112, 2159. At the same time, Congress realized that unrestricted wiretapping would completely undermine traditional notions of privacy.

The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. . . . No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

*Id.* at 2154.

to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

To meet the requirement of the statute, the government, in the instant case, produced two affidavits by FBI Special Agent John Huntley. Each affidavit began by detailing the information already known to the government, primarily through the use of informers, and the reasons why the informers were thought to be reliable. The FBI was apparently well aware of the roles played by London, Genco, Isella and Himes. In addition, the FBI knew that certain premises (London's office and Himes' residence) were being used to conduct the gambling business. However, the identities of many other participants, including most bookmakers who regularly "laid off" bets, were not known. The affidavits concluded with the following recitation:

NEED FOR INTERCEPTION

1. The confidential informants described herein have categorically refused to testify in open court for fear of their personal safety and that of their families.

2. Normal investigative techniques are unlikely to succeed:

(a) Without the testimony of the above-mentioned informants it would be exceedingly difficult to prove the complete nature of the current gambling operation of Robert "Fifi" London, Albert Carmen Isella, Richard "Dick" Genco, Robert Leroy Himes, Susan Himes, Robert John Thibou, Melvin Eugene Brzostek, Orva Elerson "Lucky" Robinson, Ambrose Robinson and others as yet unknown.

(b) It is doubtful that a search warrant, if obtained and executed, would result in obtaining gambling records sufficient to show the complete nature of this gambling operation. From my experience and the experience of other Agents, I know that gambling raids and searches of gamblers and their gambling establishments have not in the past resulted in the gathering of physical or other evidence to prove all elements of the offenses. This is particularly true in regards to evidence relating to the "lay-off" part of a gambling operation. I have found through my experience and the experience of other Special Agents who have worked on other gambling cases that gamblers frequently do not keep incriminating records. If such records have been maintained, usually gamblers, immediately prior to or during the physical search, destroy these records. Additionally, records that have been seized in past gambling cases have generally not been sufficient to establish all of the elements of said offenses because such records are difficult to interpret and many times are of no significance without more complete knowledge of the gamblers activites.

(c) There are no known witnesses who could be relied upon to truthfully testify to the violation in question.

(d) Infiltration of the gambling operation by an undercover Agent does not appear to be possible in this case but even if such infiltration were possible, it would only be at the lowest level of the operation which would not result in evidence being obtained regarding involvement of the backers and the lay-off part of the operation. Nor would such infiltration, even if possible, ever be expected to discover the full scope and extent of the operation.

(e) Calling witnesses before the Grand Jury would not result in the gathering of sufficient evidence to uncover the full scope and extent of the operation. Only those individuals integrally involved in the operation at a high level have the requisite knowledge regarding the full scope and extent of the operation. Witnesses, even if immunized, are reluctant to incriminate themselves and their close working associates. Together their testimony would require immunization and nonprosecution of those who are the principals of the operation. But, even if obtained, their testimony is not corroborated.

3. Due to the manner in which the violations are carried out, the intercep-

tion of these communications is the only available method of investigation which has a reasonable likelihood of securing the evidence necessary to prove the commission of this violation.

Defendants suggest that the affidavits fall short of establishing the degree of need specified in the statute. We disagree.

The showing of need made pursuant to § 2518(1)(c) is "to be tested in a practical and commonsense fashion." [1968] U.S.Code, Cong. & Ad.News, pp. 2112, 2190. *See United States v. Armocida*, 515 F.2d 29, 37–38 (3 Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. James*, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1015–16, *cert. denied*, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). Applying this test, we find that the affidavits constitute a sufficient basis from which the district court could, and did, conclude that wiretaps were essential to the success of the investigation.

Defendants urge that the affidavits are flawed in that they clearly identify four principals (*i. e.*, London, Genco, Isella and Himes). While ample evidence may have been available to arrest and convict this foursome, the government is not precluded from carrying the investigation further. In particular, the government has a valid interest in uncovering the names and locations of various "backers," bookmakers who regularly "lay off" bets and thereby supply the organization with capital. The situation is directly analogous to that considered by the district court in *United States v. Staino*, 358 F.Supp. 852 (E.D.Pa.1973). In *Staino*, the court considered a telephone "tap" which led to the arrest and prosecution of two individuals dealing in counterfeit currency. The telephone tap was authorized by the district judge after review of an FBI affidavit. The affidavit clearly established government knowledge of defendants' role as conduits for the bogus currency. Defendants ultimately sought to suppress all wiretap evidence, alleging that the affidavits set forth sufficient facts which could have led to their conviction. The district court rejected this argument.

Defendants argue that according to statements in the affidavit, sufficient evidence existed prior to the wiretap to convict [them] both . . . if that evidence was shown to be true. But, although it is likely that probable cause existed for these arrests, it cannot be supposed that there was the faintest reason to think that the trail ended there. By its very nature, the illegal possession of and dealing in counterfeit notes involves, in most instances, many individuals who would be liable as co-conspirators. And even though the investigative agents were able to uncover the first layer of the operation, a substantial likelihood existed that other persons were involved in the same enterprise. Plainly, normal investigative procedures had ceased to be effective once the visible members of the hierarchy, if one existed, were discovered. To suppose that the investigation should have terminated at this point is unrealistic. These men were merely the tip of the iceberg; they could always be replaced. In order to root out the offense, those who were ultimately responsible— individuals who were the source of the counterfeit notes and who placed them into circulation—had to be found,

. . . . .

*Id.* at 857. Here, it was vital for the government to uncover the source of the "lay off" bets themselves, professional bookmakers who "fueled" the operation and who would simply find replacements once the four principals were swept away.

Defendants attempt to distinguish *Staino* by arguing that the four principals could have led FBI agents to other participants. In particular, they point to a list of names kept by Genco and apparently known to police. They suggest that normal search and seizure or infiltration would have produced the list, which in turn would have revealed the names of all co-conspirators. This issue is directly addressed in the affidavits and the averments made therein are uncontradicted by any facts of record. The government, not unreasonably, concluded that searches in this type of case are unpro-

ductive because gambling records are habitually hidden, destroyed in police raids, or written in special code. Infiltration was also rejected as impractical. The government asserted that it sought information concerning the highest levels of the conspiracy; infiltration would be possible only with regard to the lowest levels and would be ineffective to uncover the full scope and extent of the operation. Similar declarations were accepted by this court in dealing with another "lay off" business. *United States v. Bobo*, 477 F.2d 974, 983 (4 Cir. 1973), *cert. denied sub nom., Gray v. United States*, 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975). In *Bobo*, we concluded that statements of the kind set forth in the government's affidavits, untainted by any showing of inaccuracy or exaggeration, were sufficient to establish that searches and infiltration (among the many techniques considered) were poor substitutes for electronic surveillance.

Finally, defendants contend that the affidavits are deficient in failing to discuss and eliminate *all* possible alternatives to wiretapping. Defendants specifically note that Agent Huntley fails to mention physical surveillance and observation of the four known principals. We reject this argument.

■ Section 2518(1)(c) offers two alternatives to the government. It may show that traditional investigative techniques have been tried and have failed, or it may show that they are unlikely to succeed. In cases construing the first alternative, the courts have made it clear that police need not exhaust every conceivable technique before making application for a wiretap. *See, e. g., United States v. Feldman*, 535 F.2d 1175, 1178–79 (9 Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976)

(No. 76–113); *United States v. Vento*, 533 F.2d 838, 849 & nn. 15–16 (3 Cir. 1976); *United States v. Robertson*, 504 F.2d 289, 293 (5 Cir. 1974), *rehearing denied*, 506 F.2d 1056, *cert. denied*, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975). We think the same logic is applicable to the second alternative; and when applied, we think that the affidavit is sufficient to demonstrate a need for the wiretap.

### B.

Defendants next contend that the government violated the wiretap statute by monitoring *all* conversations at London's office whenever any of the three partners were present. Defendants argue that such wholesale monitoring violates the "minimization" requirement contained in the statute. We find this contention to be without merit.

■ The statute mandates that law enforcement personnel refrain from intercepting communications having little or no relation to the suspected offense:

> Every order. [authorizing a wiretap] . . . shall be executed as soon as practicable, [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter,
>
> · · · ·

18 U.S.C. § 2518(5). This provision is intended "[t]o prevent improper invasion of the right of privacy and to curtail the indiscriminate seizure of communications, . . . ." *United States v. Focarile*, 340 F.Supp. 1033, 1044 (D.Md.), *aff'd sub nom., United States v. Giordano*, 469 F.2d 522 (4 Cir. 1972), *aff'd*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).[3] We believe that the

---

**3.** The minimization requirement, along with the rest of Title III, was drafted in response to Supreme Court decisions in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). [1968] U.S.Code, Cong. & Ad.News, pp. 2112, 2153, 2163.

In *Berger*, the Supreme Court invalidated a New York eavesdropping statute as unconstitu-

tional under the Fourth and Fourteenth Amendments. Among the statute's infirmities, the Court noted a complete failure to prevent indiscriminate wiretapping.

[The New York statute] authorizes the "indiscriminate use" of electronic devices specifically condemned in *Osborn* [*v. United States*, 385 U.S. 323, [87 S.Ct. 429, 17 L.Ed.2d 394] (1966)]. "The proceeding by search warrant is a drastic one," *Sgro v. United*

requirement has been met in the instant case.

■ The wiretap statute does not require that all innocent communications be left untouched. Congress recognized that legitimate investigations would often uncover harmless conduct within the midst of its unlawful counterpart. Accordingly, the wiretap statute merely provides that unnecessary intrusions be minimized, or reduced to the smallest degree possible. In testing compliance with this requirement, the courts have proceeded on a case-by-case basis, invoking a standard of reasonableness. See [1968] U.S.Code, Cong. & Ad.News, pp. 2112, 2192; *United States v. Daly*, 535 F.2d 434, 441 (8 Cir. 1976); *United States v. Armocida*, 515 F.2d 29, 42 (3 Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Quintana*, 508 F.2d 867, 873–74 (7 Cir. 1975); *United States v. James*, 161 U.S.App.D.C. 88, 494 F.2d 1007, 1018, cert. denied, 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). The statute is deemed to be satisfied if "on the whole the agents have shown a high regard for the right of privacy and have done all they *reasonably* could to avoid unnecessary intrusion." *United States v. Armocida*, 515 F.2d 29, 42 (3 Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975), quoting from *United States v. Tortorello*, 480 F.2d 764, 784 (2 Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) (emphasis in the original).

■ In analyzing a given case, the federal courts have considered three principal factors: (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed. See *United States v. Daly*, 535 F.2d 434, 441–42 (8 Cir. 1976); *United States v. Vento*, 533 F.2d 838, 852–53 (3 Cir. 1976); *United States v. Scott*, 170 U.S.App.D.C. 158, 516 F.2d 751, 758–59, rehearing denied, 173 U.S.App.D.C. 118, 522 F.2d 1333 (1975), cert. denied, 425 U.S. 917, 96 S.Ct. 1519, 47 L.Ed.2d 768 (1976); *United States v. Armocida*, 515 F.2d 29, 44–45 (3 Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Quintana*, 508 F.2d 867, 874–75 (7 Cir. 1975). When we consider each factor, we cannot conclude that the government's conduct violated the statute.

■ When law enforcement officials are confronted with large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in conducting wiretaps. The Seventh Circuit, in considering a drug conspiracy, held that

[l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy.

*United States v. Quintana*, 508 F.2d 867, 874 (7 Cir. 1975). In fact, the legitimate

---

*States*, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260, 262, [85 A.L.R. 108] (1932), and must be carefully circumscribed so as to prevent unauthorized invasions of "the sanctity of a man's home and the privacies of life." *Boyd v. United States*, supra, 116 U.S. 616, at 630, 6 S.Ct. 524, 532, [29 L.Ed. 746, at 751]. New York's broadside authorization rather than being "carefully circumscribed" so as to prevent unauthorized invasions of privacy actually permits general searches by electronic devices, . . . . .
388 U.S. at 58, 87 S.Ct. at 1883. Minimization and its companion safeguards were designed to assure that

the order [authorizing a wiretap] will link up specific person, specific offense, and specific place. Together [the provisions of Title III] are intended to meet the test of the Constitution that electronic surveillance techniques be used only under the most precise and discriminate circumstances, which fully comply with the requirement of particularity. S.Rep. No. 1097, 90th Cong., 2d Sess., 102 (1968), U.S.Code, Cong. & Ad.News 1968, p. 2191. *Bynum v. United States*, cert. denied, 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975) (Brennan, J., dissenting).

investigation of conspiracies may necessitate the interception of all or almost all communications over a given period of time. *See United States v. Chavez,* 533 F.2d 491, 493–94 (9 Cir.), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Manfredi,* 488 F.2d 588, 600 (2 Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Bynum,* 485 F.2d 490, 500–02 (2 Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), *on remand,* 386 F.Supp. 449 (S.D.N.Y.1974), *aff'd,* 513 F.2d 533 (2 Cir.), *cert. denied,* 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975); *United States v. Cox,* 462 F.2d 1293, 1300–01 (8 Cir. 1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223, *rehearing denied,* 419 U.S. 885, 95 S.Ct. 156, 42 L.Ed.2d 129 (1974).

▮ Although defendants were charged with the substantive crime of illegal gambling rather than a narcotics or other type of conspiracy, the reasoning advanced in *Quintana* applies with equal force. The government's proof established a far-flung, continuous criminal operation involving many persons, known and unknown. The purpose of the wiretap was not to ensnare the known principals. The government was primarily (and justifiably) interested in detecting the hidden members of the "lay off" operation—those who supported it and who could be expected to support another if only the principals were successfully prosecuted.

As such, continual monitoring over a three week period did not offend the statute.

By analyzing the government's expectations, courts attempt to determine whether sufficient advance knowledge was available to tailor the minimization efforts. Did the government know the identities of all suspects? Were police familiar with the timing or patterns of certain conversations, so as to distinguish between innocent and incriminating speech? *See United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1020, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). In the instant case, FBI personnel did not know the identities of all participants in the "lay off" system. Therefore the monitoring agents could not assume that certain conversations with certain individuals would clearly be irrelevant. Additionally, the government chose to utilize electronic eavesdropping rather than a telephone tap. Telephone taps enable police to divide communications into discrete units, which can then be assessed on an individual basis. If a call is personal in nature, interception may cease, subject to resumption when another call is initiated.[4] Electronic eavesdropping does not allow this degree of selectivity. Conversation may range over many subjects, shifting instantaneously and without warning. Because of this uncertainty, we cannot say that anything less than continuous monitoring would suffice.[5]

---

4. In fact, this procedure was utilized in monitoring calls at the Himes residence. As noted, *supra,* agents "spot checked" each call to determine its essential character. All monitoring and recording would cease if the call dealt with personal matters.

5. We also note that many of the conversations at London's office were in code. Special codes have continually caused problems for law enforcement personnel, especially when dealing with narcotics conspiracies. *See, e. g., United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1019, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *United States v. Bynum,* 485 F.2d 490, 501 (2 Cir. 1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974), *on remand,* 386 F.Supp. 449 (S.D.N.Y.1974), *aff'd,* 513 F.2d 533 (2 Cir.), *cert. denied,* 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975); *United States v. Cox,* 462 F.2d 1293, 1300–01 (8 Cir. 1972), *cert. denied,*

417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223, *rehearing denied,* 419 U.S. 885, 95 S.Ct. 156, 42 L.Ed.2d 129 (1974); *United States v. Sisca,* 361 F.Supp. 735, 744 (S.D.N.Y.1973), *aff'd,* 503 F.2d 1337 (2 Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).

Federal courts have traditionally allowed a greater degree of monitoring when suspects use specialized codes or jargon. *See United States v. Armocida,* 515 F.2d 29, 44 (3 Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1019, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). *But see* Note, Minimization of Wire Interception: Presearch Guidelines and Postsearch Remedies, 26 Stan.L.Rev. 1411, 1419 n. 42 (1974) (suggesting that the use of codes or jargon should not be invoked to justify departure from the minimization requirement).

**718**

■ A third and final consideration is the degree of judicial supervision while the wiretap order is being executed. Where the authorizing judge required and reviewed interim reports, courts have been more willing to find a good faith attempt at minimization. *See United States v. Quintana,* 508 F.2d 867, 875 (7 Cir. 1975) and cases cited therein. In the present case, Judge Young required periodic reports at five day intervals. The reports reflected, *inter alia,* the government's efforts at minimization. This type of judicial scrutiny further supports our conclusion that no statutory violation has accrued.

### C.

■ Defendants' third and final contention deals with the use of recording equipment. Defendants argue that the government was required to record all conversations at London's office, rather than a portion dealing with alleged gambling activities. We agree, but we do not believe that in this case reversal of the convictions is warranted.

The wiretap statute provides that

[t]he contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this subsection shall be done in such way as will protect the recording from editing or other alterations.

18 U.S.C. § 2518(8)(a). The statute does not contain discretionary language; it is an absolute command. Interceptions "shall" be recorded, if "possible." [6] As another federal court has noted, "the wiretap statute requires the recordation of intercepted communications by *any* means authorized by

the chapter, . . . ." *United States v. Buckhanon,* 374 F.Supp. 611, 615 (D.Minn. 1973) (emphasis in the original).[7] Here, the government has made no attempt to justify its failure. It has not demonstrated that recordation was impossible. We turn then to consideration of whether this omission required the suppression of all wiretap evidence and consequent reversal of the convictions. We hold that it does not.

The statute expressly prohibits the use at trial, and at certain other proceedings, of the contents of any intercepted wire communication or evidence derived therefrom "if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. The circumstances which require suppression under § 2515 are, in turn, set out in § 2518(10)(a):

(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval.

Only the first category is relevant to this case, since there is no contention that the orders were insufficient and it is manifest that the duty to record is imposed by the statute itself and not by judicial order. We must decide whether the communications introduced at trial, constituting the recorded conversations at London's office, were "unlawfully intercepted" because of the failure to record other dialogue between the co-conspirators.

Resolution of that issue depends upon three Supreme Court decisions: *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977); *United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); and *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40

**6.** S.Rep. 90–1097; [1968] U.S.Code, Cong. & Ad.News, pp. 2112, 2193 states that § 2518(8)(a) requires recording if "practicable." *See* text *infra.*

**7.** In *Buckhanon,* defendants, charged with possession of heroin with intent to distribute and with conspiracy to possess and distribute heroin moved to suppress certain evidence procured by electronic surveillance. One of the arguments concerned recordation of the communications intercepted. Defendants complained that the judicial order, authorizing the wiretaps, did not provide for recordation. The district court countered by noting that recordation was required under the statute and not by virtue of court order.

L.Ed.2d 341 (1974). These decisions hold that "[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Chavez*, 416 U.S. 562, 574–75, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974). Rather, suppression is required only for a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. at 527, 94 S.Ct. at 1832. In other words, the violation must substantially impinge upon Fourth Amendment values sought to be protected by Congress in restricting and rendering uniform the use of wiretaps.

The recording provision, contained in § 2518(8)(a), was enacted to serve an evidentiary function. Congress apparently realized that testimony by monitoring agents of what they heard would be open to attack on grounds of hearsay, failure of recollection and bias. Tape recordings, on the other hand, would be the best evidence and would be almost irrefutable if their authenticity and physical integrity were guaranteed. Accordingly, intercepted communications were to be recorded, if at all possible, and introduced in their recorded form.

The legislative history of § 2518(8)(a), though sparse, supports this view of the statute.

> Paragraph (8) [of § 2518] sets out safeguards to insure that accurate records will be kept of intercepted communications.

Subparagraph (a) requires, if practicable, that the communication be recorded on tape, wire or other comparable device. The recording must be made in such a way as will protect it insofar as possible from editing or alteration. Appropriate procedures should be developed to safeguard the identity, physical integrity, and contents of the recordings to assure their admissibility in evidence.

[1968] U.S.Code, Cong. & Ad.News, pp. 2112, 2193. In *United States v. Daly*, 535 F.2d 434, 442 (8 Cir. 1976), the Eighth Circuit has indicated that its view of the purpose of the statute is to ensure the admissibility of intercepted communications at trial.

In sum, we do not think that the recording provision was intended to limit the use of wiretapping so as to preserve rights of privacy. Recordation is required to insure that the product of surveillance will be received under traditional rules of evidence. There is no indication that § 2518(8)(a) was intended to or could fulfill the same function as exhaustion of investigatory procedures, judicial authorization and review, and minimization in protecting an individual's right to privacy.[8] It follows that a failure to record, though admittedly a violation of the statute, does not lead to suppression and reversal of the convictions. This result is dictated by the decisions in *Donovan, Chavez* and *Giordano*.

### III.

London, Jones and Cottman make an additional contention regarding the jury instructions given by the district court. We think that the charge, read as a whole, was unexceptionable and the contention warrants no extended discussion on our part.

AFFIRMED.

---

8. In a proper case, we can visualize that, aside from protection of rights of privacy, complete recording could benefit an accused, as for example where an accused asserts that a recording of an incriminating statement was offered in evidence out of context so as to magnify its incriminating effect by omitting related mitigating statements. But, in the instant case, defendants do not allege or demonstrate that any of the recorded communications were distorted or taken out of context. While recordings might be useful also to buttress a claim that minimization was not followed, such an argument is unavailing here. Because of (1) the conspiratorial nature of the offense charged; (2) the inability of monitoring agents to predict the nature of the conversations intercepted; and (3) the degree of judicial supervision involved, we have held that *continual* surveillance of London's office was proper. The same reasoning applies to wiretapping efforts at the Himes' residence, the only other use of electronic surveillance before us.