UNITED STATES of America

v.

Victor Manuel GERENA, et al.

Crim. No. H–85–50(TEC).

United States District Court,
D. Connecticut.

Aug. 11, 1988.

See also 695 F.Supp. 1369.

Albert E. Dabrowski, Carmen E. Van Kirk, John A. Danaher III, Leonard C. Boyle, Asst. U.S. Attys., Stanley A. Twardy, Jr., U.S. Atty., David D. Buvinger, William J. Corcoran, Trial Attys., U.S. Dept. of Justice, Hartford, Conn., for plaintiff.

Juan R. Acevedo, Hartford, Conn., for Norman Ramirez Talavera.

James L. Sultan, Rankin & Sultan, Boston, Mass., for Ivonne Melendez Carrion.

Diane Polan, Levine, Polan & Curry, New Haven, Conn., for Elias Castro Ramos.

James Bergenn, Shipman & Goodwin, Hartford, Conn., for Carlos Ayes–Suarez.

Richard Reeve, Asst. Federal Public Defender, New Haven, Conn., for Isaac Comacho–Negron.

Linda Backiel, Hartford, Conn., for Antonio Camacho–Negron.

Leonard I. Weinglass, New York City, for Juan Segarra–Palmer.

Richard J. Harvey, Hartford, Conn., for Filiberto Ojeda–Rios.

Margaret P. Levy, Hartford, Conn., for Angel Diaz Ruiz.

Michael Deutsch, Chicago, Ill., for Orlando Gonzalez–Claudio.

John Williams, Williams & Wise, New Haven, Conn., for Hilton Fernandez–Diamante.

Ronald L. Kuby, New York City, for Luis Colon Osorio.

Roberto Jose Maldonado, New Haven, Conn., pro se.

F. Mac Buckley, Buckley & Santos, Hartford, Conn., for Paul Weinberg.

Jacob Wieselman, Blume & Elbaum, Hartford, Conn., for Luz Berrios–Berrios.

Harold Meyerson, New York City, for Jorge Farinacci–Garcia.

## RULING ON DEFENDANTS' MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE EVIDENCE AND THE FRUITS THEREOF FOR ALLEGED LISTENING WITHOUT RECORDING

CLARIE, Senior District Judge.

By motion dated December 22, 1986, defendant Ivonne Melendez–Carrion moved to suppress electronic surveillance evidence on the basis that monitoring agents failed to record all communications to which they listened. Through this motion, joined in by all codefendants, the defense has alleged that, throughout the electronic surveillance in Puerto Rico, Federal Bureau of Investigation (F.B.I.) surveillance agents "intentionally, persistently and pervasively" listened without recording ("live monitored") in violation of Title 18 U.S.C. Section 2518(8)(a). The defendants assert that the agents' conduct requires the "complete suppression of all the recordings made pursuant to the electronic surveillance orders in Puerto Rico." A total of 1,011 tapes, mostly in the Spanish language, were recorded pursuant to court order. This Court held hearings on the instant motion from September 1, 1987 through June 28, 1988, allowing the defendants to select and cross-examine 25 of 65 monitoring agents. Having considered the evidence and testimony presented at hearing, the evidence of record and the arguments and briefs of counsel, it is the finding of the Court that monitoring agents did not "intentionally, persistently and pervasively" listen without recording. It is the ruling of the Court that suppression of electronic surveillance tapes is not warranted.

## I. *Facts*

### A. The Title III Investigation

Commencing on April 27, 1984, special agents of the F.B.I. in San Juan, Puerto Rico were authorized by Chief Judge Juan Perez Gimenez of the United States District Court for the District of Puerto Rico, to intercept communications in connection with the investigation of this case, pursuant to Title 18 U.S.C. Sec. 2516, et seq. The authorization and actual interceptions continued at locations and within vehicles in Puerto Rico, with several periods of hiatus, through August 30, 1985.

Specifically, the Title III orders authorized the interception of communications at residences and public telephones in Levittown, Taft Street in Santurce, El Cortijo in Bayamon and Vega Baja, communications at the El Centro condominium in Hato Rey. Additional authorization was received to intercept communications from the vehicle of defendant Filiberto Ojeda Rios. During the period from April 27, 1984 through August 30, 1985, 1,011 tapes of wire and

oral communications were made pursuant to these Title III orders.

### B. Procedures Established For The Conduct Of Electronic Surveillance

In April of 1984, the agents assigned to monitor communications pursuant to the first of the Title III orders were instructed by supervisory agents of the F.B.I. and Frank Bove, the supervising attorney for the Title III investigation. Agents were instructed orally and in writing. The written instructions remained essentially unchanged throughout the course of the investigation. The instructions were modified to reflect new locations and additional offenses. In particular, the interception instructions advised the surveillance agents as follows:

(1) Legally there is no difference between "monitoring and recording;" (2) Conversations which may be listened to and the minimization requirements; (3) Evidence of other crimes: action required; (4) Conversations in which named subjects are not participants; (5) New subjects; (6) Privileged communications; (7) Conversations between subjects and unknown individuals; (8) Daily plant report: log.

The interception instructions contained provisions pertaining to the recording of intercepted communications:

Anytime a conversation or any part thereof is monitored, it is to be recorded. If the machine has a separate monitor switch, such switch is not to be activated unless the machine is recording. However, if the machine malfunctions, or a tape has just run out, monitoring is permissible while the situation is being remedied. Be sure to report the overheard conversation in the logs.

The agents were required to read these instructions, and the affidavit and order for a particular location, prior to monitoring communications intercepted at that location. Attached to the instructions was a sheet which agents were instructed to date and sign to indicate that they had read the instructions.

At the start of the Title III investigation a procedure was promulgated, in writing, by Special Agent Calvin Sieg, describing what should be done in the event the reel-to-reel tapes were about to run out while an interception was occurring. (*See* GX 375A) The so-called "Sieg" procedure directed the agents to fast forward the duplicate original, remove it from the recording machine, and replace it with a new tape (which would then become the original for the next tape). That tape would be started before the other tape ran out, thus preventing a gap in the evidence.

However, during the first period of interception a different procedure was adopted whereby the agents were instructed to create a cassette tape to record conversation while the reel-to-reel tapes were being changed. Cassette tapes made pursuant to this procedure were designated "A" tapes.

Although not set forth in the written instructions, the cassette recording machine in the listening post was also used to make simultaneous cassette recordings of conversations, or portions thereof, to assist the agents in maintaining accurate logs of the conversations intercepted. These "work cassettes" were reused by monitors in the listening post. On occasion, some were taken to the F.B.I. office and delivered to the supervisory special agents when prompt action was required. At the conclusion of authorized periods of interception, any remaining cassettes tapes were run through a bulk eraser by Technical Agent Luis Monserrate. A total of 39 work cassettes were preserved by the government and filed with the Court between September and November 1987.

### C. The Monitoring Equipment At The Listening Post

Technical Agent Luis Monserrate met with monitors on various occasions to explain how to perform their monitoring duties. Agent Monserrate was responsible for the operational maintenance of the monitoring equipment in this investigation and supervised the setting-up of the equipment. Although the agents were instructed on how to operate the equipment, Mon-

serrate did not instruct the monitors in all the aspects of the capabilities of the equipment. The agents operated two reel-to-reel recording machines: one original, and the other, a duplicate original. A third recording machine, a cassette recorder, was connected to one of the reel-to-reel recording machines.

A SAMR (stand alone microphone receiver), attached to the recording equipment, was equipped with an activity alarm. The activity alarm was a light-emitting diode which had the appearance of a horizontal bar graph. The light-emitting diode responded to a level of noise from the residence and moved in the direction from left to right, with a low level of noise beginning at the left and a high level of noise causing all light-emitting diodes to light. When the entire horizontal bar graph was lit an audible activity alarm sounded and a light was activated. The audible activity alarm on the SAMR operated when sound in the target residence rose above a level previously set by the technical agent. With regard to the public telephones at Levittown and Veja Baja, the equipment in the listening post had an audible activity alarm which sounded whenever one of the public telephones was taken off the hook, even if no conversation ensued.

Each of the reel-to-reel recording machines had a tape/input switch. A monitor could improve the quality of the recording by adjusting the four levers on the lower center of the recorder, after first placing the tape/input switch at the "input" position. There was no way for a monitor to determine, based solely on the quality of the sound coming into the monitor's headphones, whether the switch on the machine was at the "tape" or "input" position. There was no light indicator to alert the monitor to the position of the switch. In order to turn the switch from tape to input, only one-sixteenth of a full turn (one-eighth of an inch) was necessary to make the change. Furthermore, the switch had some play in it and it was not always clear whether the switch was set to "tape" or "input."

Agents were instructed to turn the tape/input switch to "input" to adjust properly the record levels on the reel-to-reel machines. As a participant in a conversation moved closer to or further away from the microphone in the premises, it might be necessary to adjust the record levels. In addition, the presence or absence of television or radio, or other noise, would cause a change in the record level. Indeed, the record levels might require adjustment more than once within a single conversation. Every time the record level was adjusted, the tape/input switch, pursuant to the instructions of Technical Agent Luis Monserrate, should have been placed at the "input" position. Once the tape/input switch had been moved to the "input" position, there was no reminder—in the form of an audible signal or a visual light—that would cause a monitor to turn the switch from "input" back to "tape." In March of 1985, Agent Monserrate issued a memorandum urging monitors to adjust the control levels by first placing the tape/input switch at the "input" position. The Monserrate memorandum does not instruct the agents, however, to return the tape/input switch to the "tape" position.

Each of the reel-to-reel recording machines, the Revox A700 and Revox B77 machines, also had indicators (needles) for the volume level of the signal entering the machine. If the reel-to-reel machine tape/input switch was placed on "tape," the needles were activated only if the tapes were running. If the reel-to-reel recording machine tape/input switch was on "input," the needle was activated in both instances, when the tape was running and when it was not running.

The SAMR in the listening post was equipped with a switch referred to as the "run/off/auto" switch. If that switch had been accidentally placed in the "auto" position, a measurable amount of sound in the target residence could start the recorders running. The effect would be to automatically operate the recorders such that when the sound would cease, the recorder would stop running. If the "run/off/auto" switch on the SAMR had unintentionally been pushed to the "auto" position, it is

possible that recordings could be made without a monitor's knowledge.

### D. The Matching Of Electronic Signal On the F.B.I. And The Residence Tracks Of The Tape Recordings

The duplicate original tapes contained two recording tracks which were called the residence track and the F.B.I. track. The purpose of using two recording tracks was to enable the enhancement of duplicate original tape recordings by matching sound, recorded in stereo, on the two tracks of duplicate original tape. The monitoring agents were instructed to attempt to match the sound of television or radio on the residence track with television or radio signal in the listening post.

Technical Agent Luis Monserrate installed the Title III equipment so that sound of television or radio from the residence, recorded on the residence track of the tape, could be matched with television or radio signal recorded on the F.B.I. track of the tape. A television monitor and a radio monitor were connected to the duplicate original machine. A selector switch box permitted the monitoring agent to switch from television to radio in order to record one or the other on the F.B.I. track on the duplicate original reel-to-reel tape. If the selector switch was set for the television, and the monitor was playing the radio, no sound would be recorded on the F.B.I. track of the duplicate original tape. No electronic signal from television or radio was placed onto the original reel-to-reel tapes. The matching of electronic signal on the F.B.I. track with the sound of radio or television on the residence track was done during interceptions at Levittown and Vega Baja residences.

### E. The Conduct Of The Monitoring Agents

#### 1. *Generally*

Additional Spanish speaking agents from outside of the San Juan office of the F.B.I. were needed to monitor communications pursuant to the Title III orders in this case. Special Agent Jose P. Rodriquez was responsible for briefing those agents, who came from all parts of the United States, on the procedures to be followed in conducting the interceptions. The agents were briefed on these procedures prior to monitoring and were directed to read the written instructions on minimization, as well as the affidavit and Title III order pertaining to the location to which they had been assigned. The agents were also briefed on a regular basis by the supervisory agents on the status of the investigation, and other matters, conducted at the F.B.I. office, usually once a week.

Twenty-five of the sixty-five agents who monitored communications intercepted pursuant to the Court Orders in Puerto Rico, testified during the subject hearings. During their testimony, the agents identified the orders pursuant to which they monitored; the instructions they received prior to and during their monitoring activities; their operation of the equipment in the listening post; their maintenance of the monitor's log; their maintaining custody of the reel-to-reel tapes; the creation and reusing of work cassette tapes; the conduct of spotchecks; contact with physical surveillance agents; their attempts to match the sound of radio or television coming from the residences with electronic signal from a television and radio monitor in the listening post; their own viewing of television or listening to radio at the listening post; their use of the activity alarms in determining when, in some instances, to intercept and the operation of the equipment in the listening post, specifically including switches such as the tape/input switch which was used by the agents in making adjustments to the record levels on the reel-to-reel recording machines. Agents testified that there was a visual light activity alarm, with audible signal, on the SAMR, which was used in connection with the interception of communications from the residences at Levittown and Vega Baja.

Many of the agents testified about their attempts to match the sound of television or radio coming from the residences at Levittown and Veja Baja with electronic signal placed on the duplicate original reel-

to-reel tape from a television or radio monitor in the listening post. The television and radio monitors were connected to the duplicate original reel-to-reel recording machine. A toggle switch enabling the agent to select either the television or the radio was installed by Technical Agent Luis Monserrate. If the television or radio monitor were in the "on" position, and the selector switch was turned to the television, the television would be recorded on the F.B.I. track while the reel-to-reel tapes were running. If the television monitor was not on, nothing would be recorded on the F.B.I. track while the reel-to-reel tapes were running. Agent Balizan did not recall any instruction that the television or radio should be shut off after a spotcheck, enabling one to start clean at the next spot check.

Several of the agents testified that they listened to radio or television for their own purposes in the listening post, as well as for the purpose of attempting to match what could be heard coming from the residences. Agents testified that they were able to identify which television or radio station should be recorded on the F.B.I. track by virtue of information received from previous spot checks. They also testified that monitors communicated with each other in regard to what had happened on the previous listening day. The agents testified that there were a variety of explanations as to why a spot check might have been made at a particular time, including the fact that the target may have entered the residence and that physical surveillance agents would have advised the monitors in the listening post accordingly.

There are many instances in the monitors' logs where the monitors made specific reference to information received from physical surveillance conducted by the agents and relayed to the monitors at the listening post. For example, in the monitors' logs for Vega Baja, there are references to physical surveillance in the following logs: Vega Baja ("VB") tape # 143 at 7:39 p.m.; VB tape # 145 at 4:11 p.m.; VB tape # 148 at 8:36 a.m.; VB tape # 173 at 4:26 p.m.; VB tape # 185 at 10:52 a.m.; VB

tape # 188 at 10:18 p.m.; VB tape # 189 at 9:57 p.m.; and VB tape # 199 at 9:38 p.m.

Instances in the logs for monitoring at Levittown where a reference was made to physical surveillance are found in the following monitors' logs: Levittown ("LN") tape # 43 at 4:30 p.m.; LN tape # 49 at 10:12 p.m. and 10:19 p.m.; LN tape # 52 at 4:28 p.m. and 5:47 p.m.; LN tape # 53 at 9:11 p.m., 9:21 p.m. and 10:44 p.m.; LN tape # 61 at 3:07 p.m.; LN tape # 62 at 4:31 p.m.; LN tape # 63 at 4:13 p.m.; LN tape # 67 at 3:18 p.m., 3:51 p.m. and 4:13 p.m.; LN tape # 68 at 5:48 p.m., 7:08 p.m. and 7:21 p.m.; LN tape # 69 at 5:28 p.m.; LN tape # 78 at 6:05 p.m., 6:24 p.m., 7:08 p.m., 8:45 p.m. and 9:58 p.m.; LN tape # 83 at 2:55 p.m. and 4:08 p.m.; LN tape # 84 at 5:07 p.m. and 5:55 p.m.; LN tape # 85 at 3:36 p.m., 4:14 p.m., 4:59 p.m., 5:52 p.m., 9:12 p.m. and 9:48 p.m.; LN tape # 86 at 10:04 p.m.; LN tape # 95 at 4:00 p.m. and 10:24 p.m.; and LN tape # 96 at 6:11 p.m., 7:01 p.m. and 7:12 p.m.

With the very limited exceptions noted below, all agents testified that they understood the instructions that whatever was monitored was also to be recorded and that to the best of their knowledge, they followed those instructions.

### 2. Abelardo J. Alba

Special Agent Abelardo J. Alba was assigned to the subject investigation from January 8, 1985 to September 1, 1985. In January of 1985, Agent Alba was assigned to the interception of communications from two public payphones in Vega Baja, Puerto Rico. In March of 1985, the off-site location for monitoring communications from the Vega Baja residence merged with and moved to the off-site location near the payphones. Prior to that time only one agent was assigned to monitor the public phones. When the responsibility for monitoring the residence was merged with the duty of monitoring the payphones, two agents per shift were then assigned to the post.

Before beginning his monitoring duties, Agent Alba received instructions from Supervisory Special Agent George Clow. Agent Alba also read the court authorization order and the F.B.I.'s internal monitor-

ing instructions. The procedure for monitoring the public phones at Vega Baja required that the target of the surveillance order be identified at the telephone prior to the agent listening to and recording the conversation. Agent Alba understood that every time he activated the monitoring equipment, he was obligated to record all the sounds that were transmitted by the equipment. Agent Alba never listened to any communications over the Vega Baja residence microphone without simultaneously recording those communications on the original and duplicate original reels. However, on approximately twenty occasions, Agent Alba briefly listened to communications made over the Vega Baja telephones that he did not simultaneously record. Agent Alba listened without recording only in those instances where he could not visually determine whether a person using the payphone was a target of the authorization order. In these instances, Agent Alba listened for approximately thirty seconds to one minute simply to ascertain if the person using the telephone was, in fact, a target individual. He listened for such period of time as was necessary to determine the identity of the speaker. When Alba determined that the individual on the payphone was not a target of the authorization order, he immediately minimized the interception. None of the individuals whose conversations Alba listened to without recording were subjects of the investigation.

At the time he listened without recording, Agent Alba knew that he was required to record each and every communication which he intercepted. Nevertheless, Agent Alba disregarded this explicit requirement.

### 3. *Randolph Tyler Morgan*

Special Agent Randolph Tyler Morgan was assigned to this investigation from July 17, 1984 through September 22, 1984 and from April 25, 1985 to May 30, 1985. Agent Morgan monitored conversations intercepted from the telephones at the El Cortijo and Taft Street locations from a listening post at the F.B.I. office in San Juan from the end of July 1984 until September 1984. In April of 1985, Agent Morgan monitored the residence and two payphones at Vega Baja.

Prior to commencement of his monitoring duties at El Cortijo and Taft Street, Agent Morgan received and read written instructions, which included an application, affidavit, Court Order and instructions on how to monitor conversations. Before monitoring the residence and payphones at Vega Baja in the spring of 1985, Agent Morgan received and read an electronic surveillance application, supporting affidavits, Court Order and monitoring instructions for that location. The July 1984 instructions directed that Morgan record communications which he was listening to at any location.

However, while monitoring the Taft Street and the El Cortijo locations, Agent Morgan occasionally spot checked conversations of children and females without recording them. These unrecorded and undocumented spot checks would follow an initial duly recorded and documented spot check wherein Agent Morgan had determined that the conversations were of children and females. Agent Morgan never listened to a male voice without recording at the Taft street location. Agent Morgan listened to, without recording, the voices of children and females at the Taft street and El Cortijo locations from zero to four times per eight hour monitoring shift. He listened to these conversations for only three 3 to four seconds and, after determining that a conversation was not pertinent, he stopped listening. After waiting several minutes, Morgan would spot check again if the telephone call had not ended. On most occasions, Agent Morgan would record the spot checks, but sometimes he would not. When Morgan spot checked and recorded, he noted it in the log. He did not make note in the log of those occasions when he spot checked and did not record.

Because he had failed to identify some persons who approached the public phones and was afraid of missing a subject of the investigation on those telephones, Agent Morgan intercepted some communications from the public telephones at Vega Baja without recording or logging them, in order to identify the caller as a target of the

investigation. The pay telephones at Vega Baja were located back-to-back on a street corner approximately 50 yards from the listening post window. Morgan ordinarily determined whether a subject of the investigation was using the telephone by (1) looking out the listening post window; or (2) walking outside into the carport area of the house and looking through the back fence at the payphones.

Agent Morgan listened to short telephone calls on the Vega Baja telephones without recording them when he could not identify the caller. The short conversations which Morgan listened to were less than a minute in duration, during which time Agent Morgan determined that the conversations were not pertinent to the investigation in this case. Agent Morgan never live monitored a conversation involving a targeted individual at the Vega Baja payphones. Morgan knew that the telephone had been picked up either by looking through the window at the monitoring post, turning the machine on and listening, or hearing the beeper alarm of the pen register. Morgan listened to such conversations from zero to five times per shift.

In addition to monitoring without recording complete short calls, Agent Morgan spot checked without recording some conversations already in progress when he could not identify the parties to the conversation. These spot checks were not logged. Morgan did not listen to any conversation when he was able to visually determine that the person who approached the receiver was not a subject of the investigation.

At the time he listened without recording, Agent Morgan knew that he was required to record each and every communication which he intercepted. Nevertheless, Agent Morgan disregarded this explicit requirement.

#### 4. *Raul G. Salinas*

On June 6, 1984, Special Agent Raul G. Salinas was conducting a physical surveillance at the residence of Filiberto Ojeda Rios in Levittown, Puerto Rico. At approximately 6:05 a.m. Mr. Ojeda, who was driving a 1982 Datsun Sentra, was overheard engaging in conversation with Luis Colon Osorio. This conversation was overheard as a result of the installation of a voice monitor device in the Datsun Sentra. Agent Salinas was able to overhear a small portion of the conversation over the receiving unit in his surveillance vehicle. Because Salinas was acting as an assistant on the physical surveillance team and, therefore, did not have in his possession a recording device, the communication was not recorded.

Pursuant to F.B.I. procedures, Special Agent Salinas duly noted this occurrence in a memorandum to the Special Agent in Charge in Puerto Rico. (*See* DX. 2436)

#### 5. *Other Agents Who Listened Without Recording*

Special Agent John Galindo noted, in an affidavit filed with the Court, that during the course of monitoring electronic surveillance on June 6, 1984, a failure in the power supply for the recording device resulted in a portion of the conversation not being recorded on the tape. Agent Galindo made contemporaneous notes of this conversation in the electronic surveillance log. (*See* Log Vol. IV p. 009)

### F. The Defendants' Claims Of Proof

#### 1. *"Admissions"*

The defendants have alleged several instances where F.B.I. agents had "admitted" to listening without recording. The Court has reviewed these allegations and concludes that with the exceptions of Agents Morgan and Alba, discussed above, they are without merit.

#### 2. *"On Log, Not Tape"*

The defendants have asserted that the monitoring agents were required to note in their electronic surveillance logs each occasion when they listened to any sound pursuant to a Title III intercept. They claim that the logs reveal instances where sounds or conversations "were" heard and "noted" "on the log, but which do not appear on the tapes." In their proposed findings of fact, the defendants allege two instances where this phenomenon occurred.

The first instance concerns Agent Luis Rivera's log entry for the 9:06 p.m. spot

check on Vega Baja tape # 189. Agent Rivera's log entry contains the notation "F.B.I., we got the house surrounded." However, when the tape was played for Agent Rivera during his testimony, he stated that the tape does not contain the word "F.B.I." In the second instance, Agent Alba's log entry for the 6:57 a.m. intercept contains a notation of the name "Carlos." However, when the tape was played for Agent Alba during his testimony, he indicated that the name "Carlos" is not heard on the tape.

The defendants argue that where monitoring agents have noted an occurrence in their logs which is not audible on the tape, it is reasonable to infer that the agents heard the sounds while the reel-to-reel recording equipment was not activated. The defendants claim that the examples which they cite "lead to the inescapable conclusion that agents listened without recording throughout the entire period of electronic surveillance in this case...."

The defendants' presumptions defy common sense. It is completely illogical to believe that a monitoring agent would make entries in a log concerning information which he had purposely not recorded. Over the ten months of electronic surveillance hearings, it has become clear to the Court that the monitors were faced with a most difficult task. The electronic surveillance targets generally spoke in Spanish, often in code and their conversations were frequently deliberately masked by television, radio or other noises. The fact that there exist innocent "on log, not tape" occurrences is hardly surprising in light of the thousands of hours of taxing monitoring in this case. On this basis, and in light of the failure of the defense to offer supporting testimony from defense witnesses, it is the conclusion of the Court that the very limited instances of "on log, not tape" observed by the defense are attributable to innocuous human error by the monitoring agents in keeping detailed logs under the difficult conditions that prevailed.

### 3. "Bootleg Cassettes"

The Court has addressed the issue of work cassettes in a ruling dated August 10, 1988. For purposes of the present ruling, the Court notes that the existence of work cassettes does not establish that agents listened without recording.

### 4. "Short Intercepts"

The defendants assert that there exist "many instances of recording for less than 30 seconds and many recordings under 10 seconds in length." They argue that short intercepts indicate that the agents were listening without recording because "it would have been impossible to obtain the information which they claim to have garnered within such brief intercepts." Defendants posit that identifying voices and determining which radio and television stations were playing could not have been done within the short intercept periods recorded by the monitoring agents. Instead, they claim that the agents could only have gathered that data by live monitoring, either before or after the periods indicated on the logs.

The defendants' claim that "short intercepts" are proof of live monitoring is incorrect as a matter of fact. It is undoubtably true that, under certain circumstances, a monitoring agent might be unable to determine whether a call is relevant, identify a caller and characterize a conversation during a short interception. However, it does not necessarily follow that, under different circumstances, this information could not be obtained by a monitor through a short interception. Moreover, the government, through its detailed "Government's Reply To Defendants' 'Supplement to Motions of December 21, 1986 and Reply to Government's Response'", dated August 24, 1987, satisfactorily explained each of the "short intercepts" alleged by the defendants.

As pointed out by the government in its August 24, 1987 pleading, not one of the 119 intercepts claimed by the defendants involved an audible conversation solely between adults. Indeed, most of the "short intercepts" reveal either: (1) no activity—(i.e. the monitoring agent intercepted only silence or insignificant background noises); (2) T.V. on, no activity—(i.e. television sound but no conversation); or (3) children talking (i.e. the voices of the targets' very

young children). Moreover, the agents' identification of each of the catagories was made easier and more reliable by the fact that in many cases the subject interception was preceded by several prior interceptions which had revealed the same activity. By failing to analyze the content of the subject interceptions, the defendants failed to recognize that the events monitored during these "short intercepts" were susceptible of documentation in a very brief amount of time. Especially as regards the recordings involving children's voices, these "short intercepts" pointedly demonstrate the agents' diligence in properly minimizing their interception of non-pertinent material.

### 5. *"Pattern Breaks"*

The defendants assert that in compliance with the electronic surveillance orders which required the monitoring agents to minimize their interception of non-pertinent material, these agents (at the behest of Assistant United States Attorney Bove) developed time patterns for spot checks (e.g. they would spot check every 10 or 15 minutes). Defendants observe that analysis of the electronic surveillance logs shows that certain agents followed clear patterns in logging their spot checks. Noting where the logs reflect breaks in the agents' patterns of interceptions, the defendants insist that, like everything else under the sun, such pattern breaks "can only be explained in terms of listening without recording." The defendants' theory is that sudden breaks in the spot check pattern can only be explained by the agents actually listening to all conversations without recording and falsely noting spot checks every ten or fifteen minutes.

In support of their theory, the defendants cite examples of "pattern breaks" and claim that they are all the more significant because the defendants have alleged that they occur together with other supposed indicia of live monitoring. The Court finds the defendants' "bootstrap" argument unpersuasive. Furthermore, examination of these "pattern breaks" and other simultaneously occurring "proof" of live monitoring convinces the Court that the defendants' allegations are without merit. The

Court's review of the logs reveals several fatal flaws in the defendants' "pattern break" proof. First, the logs show that the defense has misidentified numerous alleged patterns. In certain instances, the defendants have omitted spot check entries which would undermine claims that patterns exist. They have also failed to note that reputed "patterns" were actually the entries of two different agents. Second, the written entries marking the alleged "pattern breaks" disclose that the supposed "pattern breaks" did not result in the interception of relevant conversation. In fact, out of thousands of interceptions the defendants identified only twenty-two alleged "pattern breaks" which resulted in the interception of relevant conversation. Third, as set forth in the Court's factual findings, *supra*, a significant number of alleged "pattern breaks" were the result of the monitoring agents' documented reliance on the activity alarms. Fourth, as demonstrated in the Court's findings of fact, many of the monitors broke their patterns because physical surveillance agents had alerted them to the fact that targets were heading for or entering the premises.

### 6. *"Long Waits Between Intercepts"*

The defendants define "long waits between intercepts" as "extraordinary intervals between intercepts under circumstances that are not credible." It is the defendants' allegation that these occurrences establish live monitoring because it is "not credible" that agents would have permitted lengthy intervals between interceptions. However, the clear and credible testimony of the monitoring agents at the instant hearings has established to the Court's satisfaction that interludes between interceptions were the result of a lack of relevant activity as revealed by the activity alarms, line levels or reports from physical surveillance agents.

### 7. *"Misleading Log Entries"*

The defendants allege that the electronic surveillance logs contain misleading and contradictory entries which were designed to cover-up the fact that the agents were listening without recording. The Court has examined the examples cited by the defend-

ants and finds that they are neither misleading nor contradictory. The cited entries do not support an inference that monitoring agents were listening without recording.

### 8. "Matching Proof"

The defendants have devoted the lion's share of their attention to their so-called "matching proof" (also referred to as "Lucy's Proof", after the defendant Luz Berrios Berrios its creator). The premise of defendants' "matching proof" theory is that, in an effort to enhance the audibility of the tapes, agents attempted to match the sound of the television or radio programs heard in the background of the intercepted conversations. If the monitors succeeded in matching these particular radio or television stations, it might have been possible for the F.B.I. laboratory in Washington, D.C. to technically enhance the audibility of the conversations recorded on the tapes. The defendants allege that a review of the tapes and the logs shows that the agents were matched prior to the commencement of a recorded interception, i.e., "pre-matched" to the radio or television station heard in the background of the residence. They conclude that the only way that such "pre-matching" could have occurred was if the agents had been listening without recording prior to the recorded interception and were thereby already aware of which television or radio station the targets had tuned-in. However, a thorough review by the Court of all the means by which the defendants attempted to validate their "matching proof" theory reveals that this hypothesis has no basis in fact.

### a. Defense Witnesses And Charts

#### i. *Luz Rohena*

Luz Rohena, a hairdresser and basketball player in Puerto Rico, was hired as a paralegal by the defendants because of her familiarity with television in Puerto Rico. She was recruited, trained and supervised in her work by the defendant Luz Berrios Berrios. Ms. Rohena has also become friends with Luz Berrios and Gloria Gerena, mother of defendant Victor Gerena (the defendant employee of Wells Fargo who allegedly stole the money). Luz Rohena relied upon Ms. Berrios to make certain key determinations concerning the defendants' "matching proof" charts, such as whether background sound was from a VCR, radio or television. She testified that she was instructed not to concern herself with the F.B.I. track if there was not a possibility of matching TV or radio from the residence. Consequently, her analysis necessarily excluded evidence which would show that the monitoring agents were not live monitoring.

Furthermore, on cross-examination it was developed that a chart in Ms. Rohena's handwriting, placed in evidence by the defense, concerned the identical tape for which the defense had previously submitted a chart apparently prepared by the defendant Luz Berrios. Ms. Rohena acknowledged that, in fact, she had this chart in front of her at the time she prepared her own chart and, most importantly, that she let herself be led, looking at it. Further cross-examination led Ms. Rohena to change her mind about important conclusions she had incorporated into her chart. Her testimony made it clear to the Court that she was a biased witness and, more importantly, that her bias affected her work.

Of greatest concern to the Court are the significant number of errors and inaccuracies contained in the charts prepared by Luz Rohena. Taking note of the mistakes she had found in her work, Ms. Rohena admitted that if she were to spend two or three more months reviewing the charts she could make them more accurate. In addition to the deficiencies in Ms. Rohena's work cited above, she testified that when she made a determination of a change of frequency from one spot check to another, she would only listen to the two spot checks immediately preceding the alleged match.

#### ii. *Luz Berrios Berrios*

Defendant Luz Berrios Berrios testified that she trained and supervised paralegals who worked with her in preparing defense "matching proofs" charts intended to demonstrate that monitoring agents had live monitored. She also testified that she

worked with the paralegals when they were preparing their charts. She indicated that she performed the analysis of those reels in those instances where the charts were in her handwriting and that she was responsible for the creation of a large number of the charts. Ms. Berrios was unable to tell by looking at a chart who had actually done the work. She stated that co-defendants, Orlando Gonzalez Claudio and Juan Segarra Palmer, also worked the "matching proof" in 1986, but that among the defendants only she and Mr. Segarra participated in putting information on the charts.

Ms. Berrios testified that she was a resident at Vega Baja during the period when the interception occurred and was a participant in conversations which were overheard and recorded. She indicated that she found it helpful in determining what was on the tapes that she was familiar with the voices that could be heard.

She also testified that after the March 11, 1988 so-called "Memorandum of Law" was filed by Attorney Meyerson, she and Luz Rohena determined that there were errors in some of the charts. Moreover, cross-examination has demonstrated that the defense's charts, "Lucy's Proof", are so fraught with errors, omissions, unfounded assumptions and subjective determinations as to be without any probative value.

The defense conceded the obvious bias of its live monitoring witness, defendant Luz Berrios Berrios. However, despite the defendants' concession, the actual extent of that bias became most apparent to the Court during her testimony. At hearing, she displayed herself to be a zealous champion for her cause, at one point declaring: "Once again, we have proven that in front of the Court." Furthermore, she also evidenced a selective and convenient memory of past events. While acknowledging on cross-examination that she was present at the residence of Filiberto Ojeda Rios during the period from April 1984 to July 1985, she did not remember whether she was ever there in the morning. She did not remember whether she was ever there between noon and 6 p.m. and she could not

recall whether a radio was ever playing in the residence while she was there. When part of Levittown tape # 58 was played by her defense counsel on redirect examination, she conveniently testified to what she heard. However, when asked by government counsel on re-cross whether the conversation was between the defendant Filiberto Ojeda Rios and herself, Ms. Berrios responded that she did not recall it, and that for these charts she did not hear conversations but only what was heard in the background regarding electronic sounds. She candidly stated that she was prepared to testify in terms of what "we are trying to state."

However, in assessing Ms. Berrios' testimony and the charts prepared by her or under her direct supervision and review, it is the numerous and critical flaws and omissions in the defense charts placed in evidence which is of the greatest importance to the Court. Defendant Luz Berrios Berrios frankly acknowledged that many of the errors in the charts were the result of the fact that at the time the charts were created there was a great rush to deliver them and that under that time pressure, it was difficult to hear everything on the tape. While such an admission may help explain the deficiencies in the defendants' "matching proof," it does not make those shortcomings any less significant.

The errors contained in the defense charts go to the heart of the defendants' proof. Several examples illustrate this point. At hearing, Ms. Berrios testified that radio station WIPR appeared for the first time on Levittown tape # 58. She subsequently conceded that she was in error; in fact, WIPR had been identified in the monitoring log for Levittown tape # 40. Likewise, Ms. Berrios testified that channel 2 was heard for the first time on a Sunday afternoon on Levittown tape # 83, when confronted with the log and a defense chart for Levittown tape # 2 which both showed channel 2 on an earlier Sunday afternoon, she acknowledged her error. The significance of these mistakes is that the defense was trying to establish that there were no viewing or listening patterns upon which

the monitors could have determined which stations to tune in on the F.B.I. track.

Cross-examination also revealed the defendants' false identification of F.B.I. "matches" at the commencement of spot checks. According to the defense charts for Vega Baja tape # 220, the residence and F.B.I. tracks were pre-matched at the start of the 7:18 p.m. spot check. However, when the government played the actual tape to Ms. Berrios at the hearing, she acknowledged that the two tracks were not, in fact, matched at the commencement of the spot check and that the agent matched only after the spot check had begun. (Other false identifications of "matches" by the defense brought-out at the hearing include Vega Baja tape # 247, 5:02 p.m. spot check).

A further false identification concerned Vega Baja tape # 248, 6:35 p.m. spot check. The defense chart alleged that the F.B.I. and residence tracks were matched and that both were tuned to channel 2. In truth, the log reveals that the agent was tuned to channel 5 and that there was no "match." When confronted with all the errors in their charts, counsel for Ms. Berrios, surprisingly, declined the suggestion that Ms. Berrios review the charts and point out any errors that she might be able to find. This was not the only occasion when an attorney for the defense spurned an invitation to make the presentation of its evidence on this issue more meaningful and intelligible to the Court.

Of equal importance to the numerous errors in the defendants' "proof," are the many significant omissions from their evidence. In particular, Ms. Berrios testified that pursuant to a decision by Attorney Meyerson, charts were not included in the defendants' evidence for periods when they believed there was no sound in the house. If a monitoring agent had attempted to match signals during a period which the defense had skipped, the defense charts would fail to show it. Vega Baja tape # 216 represents an instance where the defense had skipped over a particular portion of the agent's shift during which time, as acknowledged by Ms. Berrios at hearing,

the agent could be heard attempting to match television channels.

Luz Berrios further testified that it was because of a decision by Attorney Meyerson that charts were not included in the defendants' evidence for Saturdays preceding Vega Baja tape # 167. Through their chart for Vega Baja tape # 167, the defense claimed a "matching proof" for a Saturday morning spot check where the residence and F.B.I. tracks were both tuned to cartoons. The significance of this intentional omission is that the residence habits for the previous Saturday mornings indicated that there was a pattern to the television viewing by the Vega Baja residents of which the monitoring agents were aware. When the F.B.I. track for Vega Baja tape # 140, a previous Saturday, was played for Ms. Berrios at hearing, she acknowledged hearing the sound of channels changing, indicating that agents were attempting a proper match.

Moreover, the defense did not prepare charts for all occasions and such occasions would have shown that agents had properly matched. Defense witness Berrios conceded that they had also failed to include proper "matches" by the agents on those charts which they did submit (e.g. Vega Baja tape # 232, 3:43 p.m. spot check; Vega Baja tape # 227; 10:03 p.m. spot check).

Furthermore, the defendants' identification of spot checks were based upon subjective determinations. This is of particular concern because of the established bias of the individuals who prepared the charts and because of the lack of relevant expertise or competence by those individuals. The crucial determination of what radio station or t.v. channel or VCR was playing on the residence track and the F.B.I. track was frequently based on the subjective and dubious memories of Luz Berrios and Luz Rohena. For example, Luz Rohena purportedly was able to identify channel 4 because she recollected that 36 months earlier that this station had a contract for professional wrestling ads. Further, Ms. Rohena based another identification on her memory that, in 1985, the cartoon show

"Magpies" was broadcast on channel 4. In several instances, music is heard in the background on the tapes. Luz Berrios testified that she herself determined whether the music was coming from the target residence or from a neighbor's home. Such a decision would determine whether the defendants had a claim of "matching."

At hearing, the government demonstrated to the Court that there was frequently an echo on the tapes such that material recorded on the residence track would carry over and be heard on the F.B.I. track, even though the material was not recorded on the F.B.I. track. Because of this echo phenomenon, it is crucial for one listening to the F.B.I. track to ascertain whether the material on that track was actually recorded on the F.B.I. track or whether it was an echo spilling over onto the F.B.I. track. Ms. Berrios lacked any technical or other expertise which would enable her to make a proper determination of whether what was heard on the F.B.I. track was an echo. In such instances, she necessarily relied on her own subjective and biased opinion.

### iii. *"Proper Matches"*

In addition to the "proper matches" (i.e. monitor's matchings of sound after commencement of a spot check) which were established by the government during cross-examination at hearing, the defendants' own charts reflect dozens of such "proper matches." These include:

| MONITOR | TAPE | TIME OF SPOT CHECK |
|---|---|---|
| J.G. Gonzlez | Vega Baja 206 | 10:24 a.m. |
| | Vega Baja 218 | 6:02 p.m. |
| | Vega Baja 222 | 11:27 a.m. |
| | Vega Baja 226 | 7:21 p.m. |
| | Vega Baja 228 | 7:46 a.m. |
| | Vega Baja 241 | 10:16 p.m. |
| | Vega Baja 244 | 10:47 p.m. |
| D. Lujan | Vega Baja 206 | 4:38 p.m. |
| | Vega Baja 208 | 5:51 p.m. |
| | Vega Baja 208 | 5:55 p.m. |
| | Vega Baja 240 | 6:01 p.m. |
| | Vega Baja 240 | 8:26 p.m. |
| | Vega Baja 240 | 9:30 p.m. |
| | Vega Baja 241 | 7:23 p.m. |
| | Vega Baja 243 | 8:15 a.m. |
| | Vega Baja 247 | 5:20 p.m. |
| | Vega Baja 249 | 4:00 p.m. |
| L. Rivera | Vega Baja 191 | 11:02 p.m. |
| | Vega Baja 192 | 6:48 p.m. |
| | Vega Baja 193 | 9:41 p.m. |
| | Vega Baja 199 | 9:18 p.m. |
| J. Falcon | Vega Baja 86 | 6:07 p.m. |
| | Vega Baja 91 | 3:40 p.m. |
| | Vega Baja 91 | 3:52 p.m. |

| MONITOR | TAPE | TIME OF SPOT CHECK |
|---|---|---|
| R. Gauna | Vega Baja 86 | 12:50 p.m. |
| A. Martinez | Vega Baja 155 | 8:50 p.m. |
| | Vega Baja 159 | 6:35 p.m. |
| | Vega Baja 160 | 6:24 p.m. |
| | Vega Baja 167 | 4:15 p.m. |
| | Vega Baja 214 | 3:05 p.m. |
| A. Rodriguez | Vega Baja 118 | 4:35 p.m. |
| C. De La O | Vega Baja 159 | 9:22 a.m. |
| | Vega Baja 196 | 10:01 a.m. |
| R. Palacios | Vega Baja 145 | 5:24 p.m. |
| | Vega Baja 147 | 8:01 p.m. |
| | Vega Baja 197 | 5:41 p.m. |
| E. Benavidez | Vega Baja 176 | 7:11 a.m. |
| | Vega Baja 194 | 6:11 p.m. |
| | Vega Baja 194 | 6:22 p.m. |
| | Vega Baja 194 | 7:53 p.m. |
| | Vega Baja 194 | 8:15 p.m. |
| | Vega Baja 195 | 7:36 a.m. |
| | Vega Baja 195 | 9:20 a.m. |
| J. Goldsmith | Vega Baja 221 | 9:34 p.m. |
| | Vega Baja 221 | 10:33 p.m. |
| | Vega Baja 225 | 7:55 p.m. |
| | Vega Baja 239 | 6:58 p.m. |
| | Vega Baja 239 | 7:10 p.m. |
| | Vega Baja 240 | 8:54 p.m. |
| | Vega Baja 243 | 3:07 p.m. |
| | Vega Baja 243 | 3:48 p.m. |
| | Vega Baja 243 | 7:45 p.m. |
| | Vega Baja 244 | 8:20 p.m. |
| | Vega Baja 249 | 1:58 p.m. |
| R. Garcia | Vega Baja 224 | 7:37 p.m. |
| | Vega Baja 233 | 9:18 p.m. |
| | Vega Baja 245 | 9:20 a.m. |
| | Vega Baja 248 | 8:45 p.m. |
| A. Balizan | Levittown 2 | 2:57 p.m. |
| | Levittown 5 | 7:27 a.m. |
| A. Alba | Vega Baja 204 | 9:17 p.m. |
| | Vega Baja 207 | 10:02 a.m. |
| C. Alvidrez | Vega Baja 89 | 5:34 p.m. |
| E. Bejarano | Levittown 62 | 3:40 p.m. |
| | Levittown 64 | 4:18 p.m. |
| | Levittown 78 | 8:40 p.m. |
| | Levittown 78 | 8:45 p.m. |
| F. Rivero | Levittown 19 | 7:58 p.m. |
| I. Guzman | Levittown 37 | 9:35 p.m. |
| J. Island | Levittown 19 | 7:58 p.m. |
| | Levittown 21 | 10:12 p.m. |
| L. Fernandez | Levittown 21 | 10:12 p.m. |
| M. Aponte | Levittown 20 | 12:29 p.m. |
| | Levittown 51 | 7:44 p.m. |
| H. Rodriguez | Levittown 25 | 6:20 p.m. |
| A. Maldonado | Levittown 16 | 3:12 p.m. |
| R. Morgan | Vega Baja 213 | 6:25 p.m. |
| | Vega Baja 213 | 8:14 p.m. |
| | Vega Baja 214 | 8:08 p.m. |
| | Vega Baja 215 | 3:10 p.m. |
| | Vega Baja 220 | 8:21 p.m. |
| | Vega Baja 228 | 10:11 a.m. |
| | Vega Baja 234 | 4:43 p.m. |
| | Vega Baja 245 | 1:08 p.m. |
| | Vega Baja 247 | 1:57 p.m. |
| | Vega Baja 247 | 2:24 p.m. |
| | Vega Baja 247 | 3:45 p.m. |

Moreover, in an example of logical inconsistency and poor arithmetic, the defendants, while attempting to disprove the government's "dominant station theory," offered further evidence of "proper matches." In their proposed findings of fact, they stated that Agent Morgan's experience between April 25, 1985 and May 2, 1985:

shows that of the 12 [sic] occasions where TV 2 is played at the residence during that period, 7 were instances where he was not on TV at the commencement of the spot check, 5 were instances where he matched but it was merely the same station as the prior intercept, and only 2 present instances where he was on TV 2 at the beginning for a matching proof.

Such evidence helps establish to the Court that the agents properly matched radio and television signals and that they did not engage in listening without recording.

### G. Factual Conclusions

Having carefully reviewed all of the defendants' theories of proof and having examined all of the evidence, including the selected tapes and logs proposed by counsel, the Court is of the firm conviction that the monitoring agents, with the sole exceptions admitted by the agents, did not listen without recording during the subject electronic surveillance in Puerto Rico. The Court finds the defendants' claims of "massive and pervasive" live monitoring wholly without basis in the record.

### II. *Discussion Of Law*

**A. Burden Of Proof And Facts Established**

 Having alleged that F.B.I. surveillance agents "intentionally, persistently and pervasively engaged in the practice of live monitoring," the burden is on the defendants to prove that illegal electronic surveillance occurred. *Nolan v. United States*, 423 F.2d 1031, 1041 (10th Cir.1969), *cert. denied*, 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970). Moreover, the defendants were required to " 'go forward with specific evidence demonstrating taint.' " *Id., quoting, Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).

At hearing and through their submission of charts, the defendants failed to make even a *prima facie* showing of the "massive and pervasive" listening without recording which they had alleged. The only instances of live monitoring which have been established were those circumstances where agents Morgan and Alba acknowledged that they had listened without recording on particular occasions.

**B. Recording Provision Of Section 2518(8)(a)**

Title 18 U.S.C.Sec. 2518(8)(a) provides in pertinent part that:

[T]he contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device.

Of central concern is whether the failure to comply with the recording provision of Sec. 2518(8)(a) requires the suppression of electronic surveillance evidence. Title III prohibits the use at trial of any intercepted electronic surveillance "if the disclosure of that information would be in violation of this chapter." 18 U.S.C. Sec. 2515. Section 2518(10)(a) sets forth the circumstances which require suppression under Sec. 2515. That section provides for suppression where "the communication was unlawfully intercepted." Accordingly, this Court must determine whether the recorded communications to be introduced at trial were "unlawfully intercepted."

 In this regard, the Supreme Court has held that "[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.' ' " *United States v. Chavez*, 416 U.S. 562, 574–75, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974). Suppression is mandated solely for "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974). "In other words, the violation must substantially impinge upon Fourth Amendment values sought to be protected by Congress in restricting and rendering uniform the use of wiretaps." *United States v. Clerkley*, 556 F.2d 709,

**1394**

719 (5th Cir.1977), *cert. denied, Genco v. United States*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978).

This Court's research has revealed no decisions by the Court of Appeals for the Second Circuit which address the function or scope of the recordation provision of Title 18 U.S.C. 2518(8)(a). However, other circuit courts of appeals and district courts have analyzed the statutory provision in great depth and their analyses offer clear guidance in this area.

The purpose of Sec. 2518(8)(a), as shown by its legislative history, "is to ensure the admissibility of intercepted communications at trial." *United States v. Daly*, 535 F.2d 434, 442 (8th Cir.1976), *citing*, S.Rep. 90–1097, U.S. Code Cong. and Admin. News, 1968, pp. 2110, 2193. "The recording provision, contained in Sec. 2518(8)(a), was enacted to serve an evidentiary function." *Clerkley*, 556 F.2d at 719. As the court in *Clerkley* explained:

> Congress apparently realized that testimony by monitoring agents of what they heard would be open to attack on the grounds of hearsay, failure of recollection and bias. Tape recordings on the other hand, would be the best evidence and would be almost irrefutable if their authenticity and physical integrity were guaranteed. Accordingly, intercepted communications were to be recorded, if at all possible, and introduced in their recorded form.

*Id.* at 719.

■ This Court, in agreement with the analysis of Section 2518(8)(a) provided by the Fifth Circuit Court of Appeals in *Clerkley*, concludes that the recording provision was not intended to limit the use of electronic surveillance so as to preserve the rights of privacy. *Clerkley*, 556 F.2d at 719. Therefore, a failure to record does not render the electronic surveillance "unlawful" and suppression of the tapes is not required.

### C. Application Of Law To Facts

■ The Court has found that only two of a total of sixty-four monitoring agents, on limited occasion, listened without recording to intercepted communications. The defendants have cited the two agents as evidence which supports their claim that the monitors engaged in "massive and pervasive" live monitoring. Agents Morgan and Alba submitted affidavits and testified that they listened to short (less than one minute) conversations and conducted spot checks (of several seconds) simply to determine who was using the public telephones at Vega Baja. Specifically, on approximately twenty occasions, Agent Alba briefly spot checked communications over the Vega Baja public telephones in order to identify the caller's voice. Agent Morgan listened without recording to very short calls and conducted brief spot checks without recording in order to identify the caller. He listened without recording in this manner, at most, five times per eight hour shift. Albeit in violation of the F.B.I. guidelines and the statute, both agents were endeavoring to follow that part of the F.B.I.'s written monitoring instructions which directed a monitor to identify a target as the user of a public telephone prior to monitoring and recording. The actual surveillance orders, signed by Chief Judge Perez–Giminez, which authorized the wiretap did not include a prohibition against listening without recording. Both agents testified that they never intercepted a target, i.e., no words of any defendant were ever listened to without being recorded.

In addition, Agent Morgan testified that he conducted spot checks without recording while monitoring conversations over the telephones at the Taft Street and El Cortijo residences. Agent Morgan initially determined by listening and recording that either a woman or a child was using the telephone and was engaged in a non-pertinent conversation. He subsequently listened-in without recording for three to four seconds, simply to determine whether the woman or child was still engaged in the conversation.

The live monitored interceptions at the public telephones at Vega Baja and the telephones at Taft Street and El Cortijo were short and conducted for a discrete and limited purpose. The agents were not

monitoring without recording in order to listen extensively to the substance of a conversation being spoken by a target, or a general user of the public telephone. The instances testified to and set forth in the affidavits of both agents are not examples of "massive and pervasive" live monitoring. Moreover, the defendants have failed to prove, despite extensive cross-examination of twenty-five monitors, that other agents engaged in similar conduct. Thus, the actions of Agents Morgan and Alba do not support the allegation that the monitoring agents in Puerto Rico engaged in "massive and pervasive" live monitoring.

The issue, therefore, is what remedies are available to the Court when faced with the admission of two agents that they engaged in live monitoring in such limited instances. Title 18 U.S.C. Sec. 2515 provides that "whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing or other proceeding ... if the disclosure of that information would be in violation of this chapter." The Supreme Court in *United States v. Scott*, 436 U.S. 128, 139, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978) stated, "Sec. 2515 was not intended generally to press the scope of the suppression role beyond present search and seizure law ..., *citing* S.Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968), U.S.Code Cong. & Admin. News 1968, p. 2184." *See Alderman*, 394 U.S. at 175–176, 89 S.Ct. at 967–68.

In regard to the present case, no communication intercepted without being recorded, nor any evidence derived therefrom, is sought to be used against the defendants. The communications intercepted without recording at the public telephones were of nontargets, i.e., individuals who are not defendants in this case. The interceptions were of extremely short duration and the government has in no way benefited by the misdeeds of Morgan and Alba. The defendants have established no prejudice resulting from live monitoring, nor have they attempted to make such a showing. Defendants have made no claims that incriminating conversations were recorded out of

context or that monitoring agents failed to record exculpatory conversations. *See United States v. Manfredi*, 488 F.2d 588, 600 n. 9 (2d Cir.1973), *cert. denied, LaCosa v. United States*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *DePalma*, 461 F.Supp. at 824.

■ Turning to the actual interceptions listened to but not recorded by the two agents, the Court notes that no conversations involving the defendants were the subject of the isolated instances of live monitoring at the Vega Baja public telephones. Therefore, no defendant has standing to complain of those limited instances of listening without recording. *See United States v. Dorfman*, 542 F.Supp. 345, 393 n. 56 (N.D.Ill.1982), *aff'd, United States v. Williams*, 737 F.2d 594 (7th Cir. 1984), *cert. denied, Williams v. United States*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

More importantly for purposes of this case, the misconduct of Special Agents Morgan and Alba does not taint the monitoring as a whole. The two agents were attempting to abide by the F.B.I. monitoring instructions requiring identification of targets prior to interception at the payphones. There is no evidence that agents Morgan and Alba flagrantly disregarded the court order, authoring the wiretap, to engage in live monitoring simply to intrude into the private conversation of users of the public telephone, or in the case of Agent Morgan, of those individuals who resided at Taft Street or El Cortijo. Agents Morgan and Alba did not engage in a general search, prohibited by the Fourth Amendment. As noted, the Vega Baja order authorizing the interception of wire communications contained no provision that communication on the public telephones be monitored only when physical surveillance determined that one of the subjects of this investigation was using the telephones (*contra* Levittown Order dated April 27, 1984 which contained an express provision regarding the interception of communications at a public telephone).

■ Similarly, turning to Title 18 U.S.C. Secs. 2515, 2518(10)(a), the Court finds that no part of the contents of such communications which the government intends to introduce in evidence were seized in violation of this chapter. The communications monitored and recorded by Agents Morgan and Alba were not unlawfully intercepted, i.e., tainted, merely because the agents engaged, under the limited circumstances noted above, in live monitoring.

In light of the thousands of hours of electronic surveillance in this case in Puerto Rico, the misconduct of Agents Morgan and Alba constitutes no more than a *de minimis* transgression of the statute which does not require the suppression of all the electronic surveillance tapes. *See Daly,* 535 F.2d at 442 (listening to but not recording less than ten percent of conversations involved did not rise to statutory violation); *Clerkley,* 556 F.2d at 718 (failure to record eighty percent of monitored conversations did not require suppression); *DePalma,* 461 F.Supp. at 824 (S.D.N.Y. 1978) (*de minimis* violation of recording provision does not result in suppression).[1]

While the circumstances wherein Agents Alba and Morgan intercepted communications without recording do not trigger suppression under Title 18 U.S.C. Sec. 2515 or the Fourth Amendment, this Court views these agents' disregard for the recording provision of Section 2518(8)(a) and the clear monitoring instructions of their superiors as serious violations of statutory law and internal F.B.I. directives, designed to ensure compliance with the law. Because this Court lacks the power or authority, under these circumstances, to impose an appropriate sanction, it strongly commends these transgressions to the attention of the Department of Justice, which bears ultimate responsibility for the official actions of these agents of the F.B.I., for appropriate disciplinary action.

The defendants have asserted that a singular occasion where Special Agent Rene Salinas listened to a briefly intercepted conversation, while acting as a physical surveillance agent, and hence not in possession of a recording device, constituted listening without recording and a violation of the recording provision of Title III. Defendants have also alleged that instances where recording equipment malfunctioned and agents were briefly unable to capture all sound on tape, comprise live monitoring and a violation of the recording provision. However, the clear language and express provisions of Sec. 2518(8)(a) make plain the fact that such instances do not constitute a violation of that statute.

Title 18 U.S.C. Sec. 2518(8)(a) requires that the contents of communications shall *"if possible,* be recorded on tape or wire or other comparable device." (emphasis added). The Senate Report for Sec. 2518(8)(a) states that any interception must be recorded *"if practical."* S.Rep., 90–1097 at p. 2193. Both the text of the statute and its legislative history reveal that Sec. 2518(8)(a) does not set forth an "absolute mandate" that agents record all intercepted communications. As the above stated instances presented situations where recording was not possible, they fall outside of the recording requirement of the statute.

The defendants have also asserted that the Fourth Amendment's prohibition against general searches "dictates suppression of the tapes." The Court, having found that in the overwhelming majority of instances the monitoring agents complied fully with the pertinent statutory requirements and court orders, concludes that there is neither substance nor merit to this

---

1. In their "Supplement To Memorandum On Listening Without Recording", the defendants summarized the "proof" which they intended to present at hearing, stating:

 Defendants intend to prove that out of 2013 interceptions analyzed at the Vega Baja residence, the 89 instances in which the agents correctly anticipated the station to which the residents had turned since the previous interception ... and the 25 instances of such matches ... out of the 118 interceptions studied in the Levittown residence....

 Even assuming, *arguendo,* that the defendants had been able to establish every fact which they indicated they intended to prove in their "matching proof," the extent of live monitoring involved would still be *de minimis,* as "matching proofs" occur in less than 5% of the spot checks analyzed by the defendants.

claim. Likewise, the defendants' argument that their Fifth Amendment due process rights were violated is untenable in light of the Court's finding that agents did not engage in the "pervasive and massive" live monitoring (which the defendants allege as a basis for this claim).

### Conclusion

The Court having found that the defendants' allegation of "pervasive and massive" live monitoring is wholly without basis in fact and that the few actual instances of listening without recording which did occur constitute no more than *de minimis* transgressions of the statute, it is the ruling of the Court that the defendants' motion to suppress electronic evidence for failure to record is denied.

SO ORDERED.